JOAN BERNARD ARMSTRONG, Chief Judge.
 

 STATEMENT OF CASE
 

 On January 15, 2004, a grand jury indictment was issued charging the defendant, Isiah Fisher, with one count of aggravated rape. The defendant pled not
 
 *1022
 
 guilty at his arraignment on January 26, 2004. On September 14, 2004, the State filed its response to the defendant’s motion for bill of particulars and motion for discovery. Among other motions, the State also filed a
 
 Priemr
 
 Notice informing the defendant that it sought to introduce evidence that the defendant committed numerous acts of sexual abuse upon his biological daughter between 1981 and 1986 in an around the Parishes of Ascension and Calcasieu in the State of Louisiana.
 
 [1]
 

 On November 12, 2008, the defendant elected trial by judge. He was found guilty as charged. On May 15, 2009, the defendant filed a motion for new trial and for arrest of judgment. The trial court denied the motion. The defendant waived all delays, and was sentenced to serve life imprisonment in the custody of the Department of Corrections without benefit of probation, parole, or suspension of sentence. The defendant’s motion for appeal was granted.
 

 |
 
 STATEMENT OF FACT
 

 The victim’s father, C.S., testified that in the summer of 1999, he was living with his daughter, D.S., in New Orleans, Louisiana, who was eleven years old at the time.
 
 [2]
 
 The father had custody of his daughter, but her mother, A.W. would take her on the weekends. On August 14, 1999, a Saturday, C.S. dropped his daughter off at her grandmother’s house sometime before noon. The defendant was married to D.S.’s grandmother at that time and lived at the same location.
 

 A.W. testified that she had a sister and brother who lived with her mother. On August 14, 1999, A.W., her mother, sister, and brother attended the funeral of a family friend. When she and her family left for the funeral, D.S. stayed at the house to watch her younger sister and brother, as well as a younger cousin. The defendant was not at the house when the adults left. A.W. could not recall if he was there when they returned later that evening.
 

 In 2003, A.W. was living in Georgia, and her daughter was living in Texas. In April of that year, she remembered receiving an instant message from her daughter. Her first reaction was to call and speak with her. After that, A.W. telephoned several family members to inquire whether they had ever been molested, harassed or approached by the defendant. One of the people A.W. called was J.L., the defendant’s daughter.
 

 Based on her conversation with J.L., A.W. was able to convince D.S. to give a statement to the police, which she did in June of 2003. A.W. waited until June 2003, when school had let out, to travel to New Orleans to meet with the police. 13After meeting with the police, A.W. took D.S. to Children’s Hospital and to the Children’s Advocacy Center.
 

 D.S. testified that sometime prior to April 14, 1999, she went to her grandmother’s house to baby-sit her brother, sister and her cousin because her mother was going to attend a funeral. After the adults left the house, D.S. was in the front of the house watching television and listening to music. The younger children were in the back of the house playing.
 

 D.S. was dancing to a song when the defendant entered the room and braced up against her, putting his arms around her waist. D.S. did not hear the defendant enter the house. D.S. moved away from the defendant and went to the back of the
 
 *1023
 
 house where the other children were. D.S. remained in the back of the house until she heard a car start in the rear of the house. Believing that the defendant had left, D.S. went back to what she was doing in the front of the house.
 

 Approximately twenty or thirty minutes later, D.S. was seated on the sofa when she felt someone put their arm across her chest and saw the defendant come around to the front of the sofa. She did not hear him renter the house through the back door.
 

 The defendant used his arm to keep her from getting up. When he came around to the front of the sofa, he began to pull down her pants. He was covering her mouth. After he removed her pants and underwear, he unbuckled his pants and removed his penis. The defendant repositioned D.S. towards the edge of the sofa and then inserted his penis into her vagina while he lay on top of her.
 

 After he was finished, he pulled his pants back up and left the room. He returned with a wash cloth and told her to wipe herself off and then went into the 14backyard. Later that day he told her not to tell anyone or he would do the same thing to her sister, which is why she did not tell anyone about being raped.
 

 In April 2003, while D.S. was living in Texas with her father, she disclosed what had happened to her to a speaker who came to her church to talk about her own sexual abuse, and who encouraged her to tell her father. Instead, D.S. went home and sent her mother an instant message that she had something really important to tell her. After that, her mother called her.
 

 The defendant’s daughter, J.L., who was thirty-six years old at the time of trial, testified that she first met her father when she was five or six years old when she was living in Donaldsonville, Louisiana, with her grandmother, the defendant’s mother.
 

 Approximately every other weekend the defendant would take her in his car to St. James, Louisiana, where he lived with his girlfriend. Her father would always take the river road and stop at the sugarcane fields where he would stop the car touch her on her breast and in between her legs. She was eight years old at the time.
 

 By the time J.L. reached eleven, the defendant began penetrating her vaginally. The first instance occurred in Donaldson-ville at her grandmother’s house. While she was still eleven, she moved to Lake Charles, Louisiana, to live with her father. While there, he would penetrate her almost on a daily basis. She became pregnant by her father that year and then moved to Lafayette, Louisiana, to live at a home for unwed mothers.
 

 J.L. gave birth to a baby boy on May 25, 1986. She moved back to Lake Charles briefly and then to Ascension Parish to live with her mother. The child died in October of 1986.
 

 | SJ.L. did not see her father again until 1987 when he came to a family gathering. He told her that he had come to pick her up, and she asked him why he did not tell everyone what he had been doing to her. He drove off in his car. Approximately one year later, her father began seeing S.B. (D.S.’s grandmother) and because S.B. assured her that everything would be all right, J.L. let her father back into her life.
 

 J.L. related a telephone conversation she had with her father and his sister in which her father asked her to tell everyone that she made the allegations up about his having sex with her. He told her that no one needed to know that he was baby Darryl’s father and that it could be their secret. J.L. also recalled a sequence of
 
 *1024
 
 phone conversations she had in 2003 which culminated in her speaking with A.W., to whom she told that she knew that her father done something to someone else, and that person was herself.
 

 J.L. explained that she waited so long to tell anyone else about what had happened because she did not believe that her father would sexually assault anyone else and because she was afraid of him. She noted that he carried a gun. She also stated that he had threatened her.
 

 In June of 2003, J.L. was living in Don-aldsonville. She traveled to New Orleans to meet with a detective, and she informed him of her father’s conduct. D.S. and her mother accompanied her. The detective alerted the police in Ascension Parish where the defendant was charged with aggravated rape. J.L. informed that the trial was scheduled to begin the following week. J.L. related that her father was also charged with rape in Calcasieu Parish where his trial had been completed.
 

 |KThe State introduced a certified copy of the defendant’s conviction showing that he was convicted of one count of forcible rape and one count of attempted aggravated rape in Calcasieu Parish.
 

 The parties stipulated that Dr. Ellie F. Westman was an expert in the field of forensic pediatric medicine and in pediatric sexual abuse. Dr. Westman testified that she examined D.S. on June 13, 2003, at Children’s Hospital in New Orleans. Initially, D.S. provided her with a history regarding the assault, which Dr. Westman related to the court. Dr. Westman testified that upon her examination she observed a transaction of the hymen at the 6:00 o’clock position, which could only be caused by penetrating blunt force trauma. This injury was consistent with vaginal penile penetration and consistent with a child who had been sexually assaulted. Dr. Westman opined that in her expert opinion, D.S. was sexually abused.
 

 ERRORS PATENT
 

 A review of the record for errors patent reveals none.
 

 ASSIGNMENT OF ERROR
 

 In his sole assignment of error, the defendant contends that the testimony and evidence relating to his conduct involving J.L. should not have been admitted as its prejudicial effect outweighed its probative value.
 

 The record reflects that the trial court considered the admission of the evidence under La. C.E. art. 404(B)(1).
 
 [3]
 
 However, the issue is more properly addressed under La. C.E. 412.2 which provides as follows:
 

 |7A. When an accused is charged with a crime involving sexually assaul-tive behavior, or with acts that constitute a sex offense involving a victim who was under the age of seventeen at the time of the offense, evidence of the accused’s commission of another crime, wrong, or act involving sexually assaul-tive behavior or acts which indicate a lustful disposition toward children may be admissible and may be considered for
 
 *1025
 
 its bearing on any matter to which it is relevant subject to the balancing test provided in Article 403.
 

 B. In a case in which the state intends to offer evidence ünder the provisions of this Article, the prosecution shall, upon request of the accused, provide reasonable notice in advance of trial of the nature of any such evidence it intends to introduce at trial for such purposes.
 

 C. This Article shall not be construed to limit the admission or consideration of evidence under any other rule.
 

 In determining whether such evidence will be admitted at trial, Louisiana Code of Evidence article 403 provides:
 

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.
 

 In 2001, the legislature enacted La. C.E. art. 412.2 in response to the Louisiana Supreme Court’s limitation of the “lustful disposition” exception to other crimes evidence as allowed by La. C.E. art. 404(B)(1) in
 
 State v. Kennedy,
 
 2000-1554 (La.04/03/01), 803 So.2d 916 and
 
 State v. McArthur,
 
 97-2918 (La.10/20/98), 719 So.2d 1037, and to allow admission of evidence of other similar cranes even for general intent crimes such as aggravated rape.
 
 See State v. Williams,
 
 2002-1030 (La.10/15/02), 830 So.2d 984.
 
 [4]
 

 |sThe defendant contends that the evidence regarding the abuse of J.L. was more prejudicial than probative because unlike the allegations regarding D.S., the allegations involved prolonged abuse culminating in daily sexual intercourse and were therefore dissimilar and more serious. The defendant also suggests that in relative terms, the volume of evidence concerning J.L. substantially exceeded that regarding the charged offense, which made it overly prejudicial.
 

 Probative evidence is necessarily prejudicial, as it tends to establish the defendant’s guilt. Accordingly, La. C.E. art. 403 only prohibits relevant evidence whose “probative value is substantially outweighed by the danger of unfair prejudice.” (emphasis added.). Regarding the proper balancing between the probative value of evidence and its prejudicial effect required by article 403, the Louisiana Supreme Court has noted:
 

 Although a defendant’s prior bad acts may be relevant and otherwise admissible under ..., the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree.
 
 State v. Germain,
 
 433 So.2d 110, 118 (La. 1983). As used in the balancing test, “prejudicial” limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial.
 
 Id.
 
 See also
 
 Old Chief v. United States,
 
 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)(“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.”).
 

 
 *1026
 

 State v. Rose,
 
 2006-0402, p. 13 (La.2/22/07), 949 So.2d 1236,1243-1244.
 

 In this case, the evidence relating to the defendant’s history of abuse of his daughter, as it related to the purported rape of his wife’s granddaughter, was unquestionably of a highly probative nature, which is evidenced by our state courts |9having consistently affirmed the introduction of evidence showing that a defendant had previously molested a relative of the defendant.
 

 In
 
 State v. Tyler,
 
 619 So.2d 807 (La.App. 1st Cir.1993), evidence that the defendant raped two nieces in their pre-teen years was found to be properly admitted at defendant’s trial for the aggravated rape of his stepdaughter. Notably, the two girls were at a similar age when the offenses occurred, and the rapes occurred under similar circumstances (the rapes occurred when the defendant was in charge of the girls, either by babysitting his nieces or by taking care of his stepdaughter).
 

 In
 
 State v. Allen,
 
 26,547 (La.App. 2 Cir. 12/7/94), 647 So.2d 428, evidence that the defendant molested two young female relatives under circumstances similar to those in which the defendant was alleged to have molested his daughter was admitted because it demonstrated the defendant’s “lustful disposition” toward female relatives and his motivation by unnatural interest in prepubescent females.
 

 In
 
 State v. Johnson,
 
 95-1002 (La.App. 3 Cir. 3/6/96), 670 So.2d 651, the defendant was charged with the aggravated rape of his daughter, and evidence that he had previously molested his daughter’s younger sister was relevant to show his propensity to engage his young daughters in sexual relations.
 

 In
 
 State v. Howard,
 
 520 So.2d 1150 (La.App. 3rd Cir.1987), in the defendant’s trial for the aggravated rape of his eleven year old daughter, evidence of his previous sexual assaults against a different daughter during her pre-teen years and under similar circumstances was properly admitted as it demonstrated motive and a plan to systematically engage in nonconsensual sexual relations with his daughters as they matured physically.
 
 See also State v. Boudreaux,
 
 95-153, p. 10 (La.App. 5 Cir. 9/20/95), 662 So.2d 22, (testimony of victim’s oldest sister that defendant | inmolested her during same period that the defendant was accused of raping youngest daughter was admissible in prosecution for rape to show defendant’s systematic plan, opportunity and motive).
 

 Likewise, in cases where the uncharged sex acts were committed against a child who was unrelated to the defendant, courts have repeatedly ruled that such evidence is admissible under various theories on a case-by-case basis. See
 
 State v. Sturdivant,
 
 27,680 (La-App. 2 Cir. 2/28/96), 669 So.2d 654;
 
 State v. Davis,
 
 97-331 (La.App. 3 Cir. 10/29/97), 702 So.2d 1014;
 
 State v. Free,
 
 26,267, (La.App. 2 Cir. 9/21/94), 643 So.2d 767;
 
 State v. Hanks,
 
 593 So.2d 971, 973 (La.App. 5 Cir.1992).
 

 Regarding, the claim that the volume of evidence relating to J.L. was simply too prejudicial, a similar issue arose in
 
 State v. Driggers,
 
 554 So.2d 720 (La.App. 2 Cir. 1989), where the State introduced testimony from six other victims that they were sexually molested when they were between the ages of four and thirteen years old, and the crimes occurred between seven to twenty-six years before the charges. In finding that the probative value outweighed the prejudicial effect of the evidence, the court stated:
 

 [T]he continuity and consistency with which the other crimes occurred indicate a
 
 pattern
 
 of behavior and not merely one or two isolated incidents. The significance of the other crimes lies as much in what motivates defendant to act as in what oc
 
 *1027
 
 curred. His apparent tendency to partake in pedophilic activities is of long standing and appears to be firmly entrenched.
 

 554 So.2d at 727 (emphasis in original).
 

 Drigger’s
 
 analysis is equally relevant here. Although the accusation against the defendant involved a single event and his mistreatment of J.L. occurred over a 11 [lengthy period of time, his treatment of J.L. firmly established his propensity to engage in vaginal intercourse with young girls, and that he was not dissuaded by affinity.
 

 Additionally, contrary to the defendant’s portrayal, J.L.’s testimony under direct and cross examination was relatively brief and consists of only twenty pages of the one hundred and fifty page trial transcript. Furthermore, J.L.’s testimony regarding the defendant’s specific acts was straightforward and presented without any unnecessary or graphic detail.
 

 The defendant also contends that he was prejudiced when J.L. was allowed to testify that he carried a gun. It should be noted that J.L. did not indicate that the defendant threatened her with a gun, only that she was scared of him because he carried a gun. In any case, J.L.’s testimony regarding the gun was probative as it helped explain her delayed reporting of her father’s conduct, and its inclusion outweighed any potential prejudice.
 

 The defendant also contends that J.L.’s testimony that she became pregnant was unnecessary and created additional prejudice. While not essential to the State’s case, the evidence nevertheless depicted the natural consequences of the defendant’s actions and was also important to J.L.’s narrative, as it explained why defendant’s actions stopped, and was therefore probative.
 

 It should also be noted that the potential prejudice to the defendant in having to defend against the accusations of J.L. was less than if he had to defend against claims of a stranger, as he was in a position to identify any ulterior motives or credibility problems.
 
 State v. Jackson,
 
 625 So.2d 146 (La.1993);
 
 State v. Driggers.
 

 In sum, it is clear that the probative value of J.L.’s testimony was high.
 

 112The prejudice to the defendant was not unfair and did not substantially outweigh the probative value of the evidence. The defendant’s assignment of error is without merit.
 

 For the foregoing reasons, we affirm the defendant’s conviction and sentence.
 

 CONVICTION AND SENTENCE AFFIRMED.
 

 [1]
 

 .
 
 See Slate v. Prieur,
 
 277 So.2d 126, 128 (La. 1973).
 

 [2]
 

 . In accordance with La. R.S. 46:1844(W)(l)(a), initials of the victim and any family member are used in order to protect the identity of the victim.
 

 [3]
 

 . La. C.E. art. 404(b) provides:
 

 Except as provided in Article 412, evidence of other
 
 dimes,
 
 wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
 

 [4]
 

 . In
 
 Kennedy
 
 and
 
 McArthur
 
 the Court noted that the evidence of the defendant's “lustful disposition” sought to be introduced would be admissible if Louisiana had a similar rule to Federal Rule of Evidence 413. Indeed, the language of Article 412.2 closely follows that of Federal Rule of Evidence 413.