MADELEINE M. LANDRIEU, Judge.
|,Kaleigh Smith appeals his conviction of second degree murder. For the reasons that follow, we affirm.
STATEMENT OF THE CASE
Kaleigh Smith was indicted on December 20, 2007 for one count of second-degree murder in connection with the October 20, 2007 shooting death of Jason Anderson. Mr. Smith pled not guilty at his arraignment. Mr. Smith subsequently filed a motion to suppress identification, which was heard and denied.
Mr. Smith appeared for trial on January 4, 2010; however, trial was continued until February 1, 2010 because the State’s main witness, Cynthia Shezbie, failed to appear. On the State’s motion, the court issued a material witness bond for Ms. Shezbie. On January 8, 2010, the State filed a Brady notice to the effect that Ms. Shezbie had recently recanted her previous identification of Smith as the perpetrator of the offense charged. On January 27, 2010, the trial court heard and denied Mr. Smith’s motion to suppress his statement made to NOPD Detective Nicholas Gernon. The court also granted the State’s motions in 19limine to admit hearsay statements made by Mitchell Anderson, Melvin Noah, and Latasha Horace.
On February 6, 2010, following a six-day jury trial, Mr. Smith was found guilty as charged. On April 9, 2010, he was sentenced to the mandatory term of life imprisonment, at hard labor, without benefit of parole, probation or suspension of sentence.
On February 4, 2011, Mr. Smith filed a motion for new trial based on newly discovered evidence that allegedly impeached the credibility of Ms. Shezbie. On July 14, 2011, this Court remanded the matter to the trial court with instructions to rule on Mr. Smith’s new trial motion. The trial court denied the motion on September 22, 2011, finding that Mr. Smith had failed to demonstrate his entitlement to relief. This appeal followed.
ISSUES
On appeal, Mr. Smith asserts four assignments of error:
1. The trial court erred by admitting hearsay testimony.
2. The trial court erred by admitting evidence of the defendant’s drug use and denying the defendant’s Motion for Mistrial.
8. The verdict is unconstitutional.
4. The trial court erred by denying the defendant’s Motion for New Trial.
*682 FACTS
Sgt. Nicholas Gernon, the lead detective on this case, received a call from Detective Michael McCleary at about 2:00 p.m. on October 21, 2007, about a 1¡¡homicide in the 8700 block of Gervais Street. By the time Sgt. Gernon received word of the shooting, the scene had already been cleared. The day of the shooting, he spoke to Ms. Cynthia Shezbie, an apparent eyewitness to the shooting, who was visiting her daughter at her residence across the street from the scene. He later interviewed Ms. Natasha Horace, the victim’s fiancée, from whom he learned that Kaleigh Smith had shot the victim. Ms. Horace gave Sgt. Gernon Jason Anderson’s cell phone.[1] She also supplied Sgt. Gernon with information concerning Kaleigh Smith’s living arrangements. Based on that information, Sgt. Gernon went to the home of Mr. Smith’s wife on Chase Street and spoke with Mr. Smith’s stepson. Later that evening, he spoke with Ms. Tiffany Smith, the defendant’s wife, who told him that her husband no longer lived there, and that she had not seen him for a week prior to the shooting. Thereafter, Sgt. Gernon inventoried the items the victim had on his person at the time he died — cash, a hat, shoes, socks and other clothing — and placed them in Central Evidence and Property. Sometime later, Sgt. Gernon obtained records of the calls made to and from the victim’s cell phone prior to and after the shooting.
On October 24, 2007, Sgt. Gernon displayed a photographic lineup to Ms. Shez-bie at her residence in Atlanta. She identified the picture of Kaleigh Smith as the man she had seen shoot Jason Anderson. Based upon information received from Ms. Shezbie and Ms. Horace, Sgt. Gernon obtained a warrant for Mr. Smith’s arrest for second-degree murder. He also obtained warrants to search the homes of |4Mr. Smith’s wife and mother. A couple of hours later, the police took Kaleigh Smith into custody. Sgt. Gernon then had the defendant relocated to the Homicide Office, where he and Detective McCleary met. Sgt. Gernon read the defendant his Miranda rights, and Mr. Smith acknowledged that he understood and waived his rights. Kaleigh Smith gave the detective some background information and stated that his nicknames were “Collin” and “Wild.” Further, the defendant recounted his actions on the day of the shooting. He said he had slept at his mother’s house the night before and had gotten up around 9:00 a.m. He and his brother, Ronald, then had bought heroin and returned to their mother’s house, where they had remained for the rest of the day. His wife stopped at his mother’s house around noon. Later that day, Maurice told him “Foo” (Jason Anderson) had been shot and killed. After giving that information, Mr. Smith denied that he had killed Jason Anderson and refused to say anything else.
On the afternoon of October 25, 2007, Sgt. Gernon searched Mr. Smith’s mother’s house and confiscated two red shirts, which he then had tested for the presence of human blood; the test results were negative.[2] That same day, Sgt. Gernon obtained a recorded statement from the defendant’s brother, Ronald Dauphine. In *683 July 2008, Sgt. Gernon learned that the police had recovered a gun, which testing later confirmed was the murder weapon in this case.
Ms. Tiffany Smith, the defendant’s wife, testified that at the time of the shooting, her husband was living at his mother’s house on Dorsett Street because |sshe and he were not getting along. Mr. Smith had been living at his mother’s house for about a week prior to the shooting. On the day of the shooting, Ms. Smith had arrived at the defendant’s mother’s house between 12:00 and 1:00 p.m. She had remained at the house for several hours, into the evening, as had the defendant. Sometime late in the afternoon on the day of the shooting, a friend came to the house and told the defendant that “Foo” had been killed. According to Ms. Smith, her husband was saddened and confused by this news. Ms. Smith denied having spoken to the police the day after the shooting, and denied having told the police that she had not seen her husband in a week. She testified that she remembered only that her son told her the police had searched her house while she was not home. She explained that if she did speak with the police about the shooting, she told them that Mr. Smith had been living with his mother for approximately a week when the victim was killed rather than that she had not seen her husband in a week.
Ronald Dauphine, the defendant’s brother, testified that he and his wife, as well as Kaleigh Smith and other friends, were at the home of Evelyn Smith, the mother of Mr. Dauphine and Kaleigh Smith, when Maurice informed them that Jason Anderson had been shot. Mr. Dauphine said his brother was wearing a black or white t-shirt that day and that police took his brother’s two red t-shirts from his mother’s house following the murder. Mr. Dauphine stated that the t-shirts had been cleaned the day they were seized. Upon further questioning, Mr. Dauphine could not recall whether or not his brother was with them that day at their mother’s house. Mr. Dauphine denied that he had told the police that he and his brother had purchased drugs earlier on the day of shooting. However, he identified his voice in Ran audio recording of his taped statement. In the audio recording, which was played for the jury, Mr. Dauphine told Detective Nicholas Gernon that on the day Jason Anderson was shot, he and the defendant had left their mother’s house about 10:30 a.m. to buy drugs. They then had returned to the house, gotten loaded with some friends, and remained at the house the entire day. During further questioning, Mr. Dauphine said he had not given the police the correct time at which he and his brother had left their mother’s house. At trial he testified that they actually had returned to his mother’s house at 10:30 a.m. after having made their drug purchase.
NOPD Officer April Moses testified that on the day of the shooting, she was living in the vicinity of the 8700 block of Gervais Street. She and her children were outside cutting grass when she heard a few gunshots. After putting her children in her house, she walked to the sidewalk in front of her house. About one minute later, she heard a car screeching and saw it turn onto her street. The car passed in front of her, and she noticed that there were three people in the car — the driver, a front seat passenger and a passenger in the rear seated behind the front seat passenger. As the car approached the corner, it did not stop but slowed enough to allow the two passengers to jump from the vehicle. One of the passengers ran in one direction, and the second ran in another. Officer Moses described the passengers as two black males, — one’s hair was done in dreadlocks, and the other had a “low” hair *684 cut. One had on a white t-shirt, while the other wore a long sleeved red shirt. On October 25, 2007, Officer Moses reported her observations to Sgt. Gernon.
17Detective Carter of the NOPD investigated the homicide.[3] He arrived and secured the scene, looking for witnesses, suspects and evidence. He observed the victim’s body in a pool of blood. He then spoke to Ms. Shezbie; however, he did not obtain a detailed statement from her, only a description of the perpetrator and the clothes he was wearing. According to Detective Carter, Ms. Shezbie told him that she was inside her house when the shooting occurred.
Ms. Shezbie testified that on October 20, 2007, she was seated in the carport of the house directly across the street from Jason Anderson’s house. She heard what she thought were firecrackers. She went closer to the street to investigate the noise, and she witnessed the defendant shoot Mr. Anderson. Ms. Shezbie recognized the defendant as someone who had been to the victim’s house on prior occasions. She yelled at him to stop, and she placed a 9-1-1 call, giving information about the shooting and a description of the suspect.[4] As the defendant was running away from the scene in the direction of Goretti Park, he and Ms. Shezbie looked each other in the eye. From that meeting, she recognized Kaleigh Smith as the shooter. Ms. Shezbie was so frightened and fearful for her safety that she left the city that day to return to her home in Georgia. On her way out of town, Sgt. Gernon interviewed her on Chef Menteur Highway. Sometime after the shooting, the police came to her home in Georgia, where they displayed a photographic lineup. She identified Ka-leigh Smith’s photo as being the man she had seen shoot the victim. However, just days before trial, Ms. Shezbie recanted Isher identification of Smith because she allegedly had been receiving threatening phone calls from the Orleans Parish jail, asking her not to testify at trial. Even though she was afraid to testify at trial, she did so, and she testified that she was “one hundred percent sure” Kaleigh Smith had shot the victim. Ms. Shezbie made an in court identification of the defendant as the shooter.
Dr. Paul McGarry, forensic pathologist with the Orleans Parish Coroner’s Office, testified that he performed an autopsy on the victim’s body on October 21, 2007. Dr. McGarry identified State’s Exhibit 1 as a copy of his autopsy protocol and State’s Exhibit 2 as the diagram of the victim’s body that he had drawn to display the location of the victim’s gunshot wounds. The doctor explained that the victim died from internal hemorrhaging due to bullets having penetrated his aorta and pulmonary artery, which caused a massive amount of blood to be released into his chest cavity. Dr. McGarry also stated that blood drug screening performed on the victim’s blood was positive for the presence of benzo-diazepines, cannabinoids, diltiazem, al-prazolam and heroin/morphine. The doctor explained that these drugs are used both legally and illegally.
The State and defense entered into several stipulations that were read to the *685 jury: (1) that if Dr. Alvaro Hunt, of the Orleans Parish Coroner’s Office, were called as a witness, he would testify that he had reviewed the autopsy report of Dr. McGarry and had concluded that the victim had died as a result of four gunshot wounds, all of intermittent range — more than two and a half feet from the victim; (2) that Sgt. Gerard Winbush was an expert in the analysis and identification of firearms, and if called as a witness, he would testify that the Smith and Wesson, |ci9mm, semiautomatic pistol entered into evidence and the cartridges were recovered from the shooting scene and that the cartridges had been, in fact, fired from that particular pistol; (3) that if NOPD Detective Jason Thomas were called as a witness, he would testify that Burnell Campbell had been arrested and charged with a shooting that had occurred on June 17, 2008, that the gun entered in evidence as State’s exhibit 87 had been recovered in connection with that shooting, and that Burnell Campbell had dreadlocks at the time of his arrest.
The testimony of three of the State’s witnesses included hearsay that the trial court ruled admissible over the defense’s objection, which ruling is the subject of the defendant’s first assignment of error on appeal. These witnesses are Mitchell Anderson, father of the victim; Melvin Noah, a friend of the victim; and Latasha Horace, the victim’s fiancée. They testified as follows.
Mitchell Anderson testified that he and his son, Jason Anderson, had worked together from time to time. He said that Jason had not finished high school, had sold drugs, and had experienced some trouble with the law — mostly drug and theft charges. Mr. Anderson testified that he had spoken to Jason on a daily basis. Approximately one month before Jason was killed, he told his father that there was a $5,000 bounty on his (Jason’s) head for something he had done in Texas. Jason also said Kaleigh Smith had informed him about the bounty, but had also said he (Kaleigh) was not going to do anything to Jason because he knew Jason was close to the mother of Kaleigh’s child. Mr. Anderson further testified that approximately two weeks later, Jason said that an unknown person had shot at him |Tnbut that the incident did not have anything to do with the bounty on his head. Mr. Anderson also testified that when he was interviewed a day or two after the shooting, he told police personnel that he believed Kaleigh Smith had been involved in Jason’s death. Mr. Anderson said he recognized the defendant because he had seen him at Jason’s house, and also because Mr. Smith had bought and sold drugs with Jason. Mr. Anderson further testified that he had given Jason $200.00 the day before he died.[5]
Mr. Melvin Noah testified that he knew both Jason Anderson and Kaleigh Smith from the neighborhood. Noah called the victim “Foo” and said that Jason Anderson’s fiancée was the mother of Noah’s godchild. He had known Jason for approximately seven years at the time of the shooting. On the day Jason died, he had called Mr. Noah and asked him if he had seen Kaleigh Smith. When Mr. Noah replied no, Jason had asked him to tell Kaleigh to call him because “he was waiting on him.” Mr. Noah asked Jason where he was, and Jason responded that he was waiting about two blocks away from his own house. Mr. Noah then identified his own phone number on a log of calls made to and from Jason Anderson’s *686 phone that day.[6] The log showed that the call was made at 12:10 p.m., approximately ten minutes before Jason Anderson was shot.
Mr. Noah further testified that he had met Jason Anderson through Jason’s fian-cée, Latasha Horace. He had spoken with Latasha the day after the shooting [nand had told her about having received the call from Jason shortly before the shooting. Mr. Noah testified that he did not know there was .a “hit” out on the victim, nor did he know of any animosity between the victim and the defendant. At that time, Ms. Horace had given him no indication that she thought Kaleigh Smith was involved in the shooting of her fiancé. However, he remained with Ms. Horace while she called the police and told them, based upon the information he had just provided her, that Kaleigh Smith was involved in Jason’s killing. He was also with her when an unknown male, approximately nineteen years old, delivered Jason’s cell phone to Ms. Horace. They checked the cell phone at that time, but found that the phone’s memory log had been erased.
Ms. Latasha Horace identified Jason Anderson as her fiancé and said that at the time he died, he was living on Gervais Street with her, their six-year-old daughter, and her two other daughters. On the day of the shooting, she had gone to an appointment and had returned to her home between 11:00 and 11:30 a.m. When she entered the house, Jason was not there, although he was supposed to be watching the kids. Instead, “Mike”[7] was there, and he told her that Jason had received a phone call to go meet someone. A few minutes later, she was in her bedroom when she heard gunfire. She ran to the window and saw Kaleigh Smith running from the area.[8] As he ran, Mr. Smith turned around giving her a view of |12his face. He was wearing a red long sleeve t-shirt and black pants. Ms. Horace ran to the corner to see if there was a car passing by, and she then noticed Jason, who was lying on the ground bleeding. She ran to him, but he was unable to speak. Ms. Horace further testified that, on the day before the shooting, Jason had told her that he wanted to change his telephone number because he did not want Kaleigh Smith calling him anymore. According to her testimony, Ms. Horace met with a detective on the evening of the shooting and told him that Kaleigh Smith had shot Jason. A few days after that, the police presented Ms. Horace with a six-person lineup, from which she identified the defendant as the person she had seen running from the scene.

ERRORS PATENT

A review for errors patent on the face of the record reveals none.

*687
ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment, the defendant argues that the trial court erred by admitting hearsay statements made by the victim to Mitchell Anderson, Melvin Noah and Latasha Horace. The defendant contends that the witnesses’ testimony was not used to establish existing mental, emotional or physical state of the victim, but rather for the impermissible purpose of establishing the state of mind and actions of the defendant.
Hearsay is defined by La. C.E. art. 801(C) as “a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in 113evidence to prove the truth of the matter asserted.” Generally, hearsay is excluded, unless specifically provided by the Code of Evidence or other legislation (see La. C.E. art. 802), because the value a jury places on a statement depends upon its declarant, and the defendant cannot challenge the declarant’s credibility by cross-examination or other safeguards of reliability if the declarant is not present at trial. See State v. Martin, 458 So.2d 454, 460 (La.1984); State v. Wiltz, 2008-1441, p. 7 (La.App. 4 Cir. 12/16/09), 28 So.3d 554, 559. If the statement is offered for a purpose other than to prove that the matter asserted is true, the statement is not hearsay. Thus, “the value of the statement as evidence does not depend on the credibility of the out-of-court asserter and the statement falls outside of the scope of the hearsay exclusionary rule. McCormick, [Evidence ], § 249, 6 Wigmore, Evidence, §§ 1766, 1788 (Chadbourne rev., 1976); 4 J. Weinstein, Evidence, Part. 801(c)[01] (1981).” Wiltz, p. 7, 28 So.3d at 559.
In the instant case, the evidence at issue was a series of statements made by the victim, Mr. Anderson, to each of these three witnesses. The defense objected on hearsay grounds. The trial court overruled the objections, relying upon La. C.E. art. 803(3), which provides in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
[[Image here]]
(3) Then existing mental, emotional, or physical condition. A statement of the declarant’s then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), offered to prove the declarant’s then existing condition or his future action.
114Pursuant to art. 803(3), statements that show the declarant’s state of mind are generally admissible if the de-clarant’s statement of mind is at issue. State v. Plaisance, 2000-1858, p. 24 (La.App. 4 Cir. 3/6/02), 811 So.2d 1172, 1190. However, such evidence may not be introduced to prove a defendant’s motive unless there is evidence to show that the declar-ant communicated his intention to the defendant. State v. Brown,, 562 So.2d 868, 878 (La.1990); State v. Doze, 384 So.2d 351, 354 (La.1984); Plaisance, supra.
In cases where courts have affirmed the introduction of such hearsay, either the declarant’s intention was at issue, or the evidence was used to establish motive where the declarant had communicated his intention to the defendant.[9] For example, in State v. Brown, supra, the defendant was convicted of killing the victim. The *688 day before the victim disappeared, she had told a friend that the defendant wanted to have sex with her, but she was not interested. The Court found that this statement, showing the victim’s revulsion for the defendant, was necessary to counter other evidence that she willingly had accompanied the defendant to the area where she was killed, and thus her state of mind was an issue at trial. The Court went to some length to distinguish testimony that showed a declarant’s “revulsion” of a defendant from a declarant’s “fear” of a defendant, noting that revulsion is not as damaging a state of mind as “fear” is. Similarly, in State v. Dooley, 38,763 (La.App. 2 Cir. 9/22/04), 882 So.2d 731, the court held |1fithat the victim’s statement that he wanted to avoid the defendant, his estranged wife, was admissible to show his dislike of her and to counter the defendant’s testimony that she and the victim had reconciled.
Likewise, in State v. Riley, 532 So.2d 1174 (La.App. 1 Cir.1988), the defendant was convicted of second degree murder for shooting his former girlfriend. He testified that the victim had contacted him and met with him, and as they were walking together, the victim had drawn a gun, which he then took from her. He testified that the victim’s brother then accosted them on the path. The brother’s gun misfired and the brother ran away, at which point the defendant shot the victim four times because he “loved her.” The defendant argued on appeal that he should have been convicted of manslaughter instead because the victim’s brother had provoked him. At trial, the State had introduced hearsay testimony from a legal aid employee who said the victim had contacted her for help in obtaining a peace bond against the defendant. On appeal, the court found that this evidence was admissible to show the victim’s state of mind because the defendant had placed her state of mind at issue by testifying she had initiated contact with him.
In State v. Adams, 2004-0482 (La.App. 1 Cir. 10/29/04), 897 So.2d 629, the court upheld the introduction of a statement by the victim, that she was going to remove her son (the defendant) from her will, as proof of the defendant’s motive because the victim had also communicated her intention to the defendant.
hfiOther courts have permitted the introduction of hearsay under art. 803(3) if the defendant has placed the victim’s state of mind at issue by claiming that the defendant killed the victim in self-defense. In State v. Martin, supra, the Court upheld the introduction of hearsay testimony that the victim had told the witness that she feared the defendant would kill her if she tried to leave him. The Court noted this testimony was relevant because it “indicate[d] that her state of mind was one of fear of the defendant and anticipation that a certain event might trigger violence against her by the defendant.” Id., 458 So.2d at 461. The Court found that the victim’s state of mind was at issue because the State needed to show that the victim’s having armed herself was defensive in nature, a fact that the jury needed to consider to evaluate the defendant’s self-defense argument, which required them to determine which party was the aggressor. In State v. Sheppard,, 371 So.2d 1135 (La.1979), the Court found that a hearsay statement from the victim was relevant to show his lack of fear of the defendant, with whom he had previously engaged in an altercation, to counter the defendant’s claim that he had killed the victim in self-defense.
In the instant case, the hearsay statements to which the defendant objected were presented by three witnesses: the victim’s father, his friend, and his fiancée. *689 The father testified that his son told him a month before the murder that Kaleigh Smith had informed him that someone had placed a bounty on his head. Jason had also told his father that Kaleigh was not going to do anything to Jason because of close family ties. Jason’s friend, Melvin Noah, testified that Jason told him | ^approximately ten minutes before his murder that he was waiting to meet with Kaleigh Smith. Jason’s fiancée, Latasha Horace, testified that the day before the shooting, Jason told her that he wanted to change his telephone number because he did not want Kaleigh Smith to continue calling him. The State argued that these statements were admissible under art. 803(3) because they showed the victim’s state of mind, the first two statements to show that he believed that he could trust Kaleigh Smith, and the last to show that Jason was wary of him. These statements would indeed show Jason’s state of mind. However, the record contains no indication that the victim’s state of mind was at issue in this case, a requirement for these statements to fit within the hearsay exception. Unlike cases in which there is a self-defense claim, such as those discussed above, here it did not matter whether the victim trusted or feared the appellant; his willingness to meet with the person who called him and purportedly killed him was not an issue at trial.
On appeal, the defendant specifically argues that the victim’s statement to his father about there being a bounty on his head was impermissibly used to establish the defendant’s motive. We agree that, in accord with the jurisprudence cited above, this statement was not admissible to show the defendant’s motive to kill Jason Anderson because there was no indication that Jason had communicated his state of mind to the defendant. Although the State argues at great length that it did not attempt to use this evidence to establish motive, the following excerpts from the State’s closing argument belie this assertion:
He [Mitchell Anderson] also told you that he had conversation [sic] with this man right here [the defendant] a month before he [the |lsvictim] was gunned down .in cold blood, that this man was telling him that there was a hit out on the victim, $5,000.00 and an unknown amount of heroin for killing [the victim].
[[Image here]]
And it’s common knowledge — everyone knows, ah, the victim — people want the victim dead. And there is also money to be made from killing the victim. And even if that wasn’t motive enough, we know the victim sells drugs and the defendant’s got a serious problem. We also know the victim trusts the defendant enough to communicate with him by phone, and enough to go meet him in the park that day. We have an opportunity, we have a motive. All of these things point to the defendant being able to kill the victim.
Considering the State’s closing argument, we must conclude that the State did attempt to use the victim’s hearsay statement concerning a bounty being on his head to establish motive.
Therefore, in the absence of any of the above-referenced factors — i.e., evidence that the victim’s state of mind was at issue or evidence that his state of mind had been communicated to the defendant — we conclude that this testimony does not fall within the ambit of the hearsay exception provided for in article 803(3). Therefore the trial court erred by admitting the hearsay statements.[10]
*690 If hearsay evidence has been improperly admitted, the trial court’s error is subject to a harmless error standard of review. The error is harmless when the appellate court finds that, in light of the evidence proving the defendant’s guilt, the verdict rendered was surely unattributable to the error. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 845 (citing Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993)).
In State v. Doze, supra, the Court held that hearsay evidence that the victim had intended to evict the defendant was improperly admitted to show his motive because the victim had not communicated this intention to him. The Court nonetheless upheld the defendant’s conviction, finding that the defendant could have inferred her intention from the fact that she had thrown his clothes out of the residence. Similarly, in State v. Johnson, 381 So.2d 436 (La.1980), the defendant was convicted of killing his girlfriend. The Court found that testimony from the victim’s friend that the victim was reconciling with her husband was inadmissible under article 803(3) to show motive because there was no indication that the victim had communicated her intention to the defendant. The Court upheld the defendant’s conviction, however, finding that the error was harmless.
In State v. Volquardts, 540 So.2d 497 (La.App. 1 Cir.1989), the defendant was convicted of killing her estranged husband. Their son testified that the victim had told him the evening before the murder that he did not feel comfortable around the defendant and that he wanted to start divorce proceedings. The court found that this evidence was inadmissible because it had not been communicated to the defendant, but the admission was harmless given other evidence of domestic violence between the two and the fact that they lived apart. Likewise, in State v. DiLosa, 529 So.2d 14 (La.App. 5 Cir.1988), the defendant was convicted of killing his wife, on whom he had taken out several insurance policies. The State 1^introduced testimony from the victim’s friend to the effect that the victim was worried about their financial status, given the defendant’s loss of employment and looming mortgage payments. On appeal, the court found that this evidence was not admissible to prove motive, but that the error was harmless.
In the instant case, the admission of Jason Anderson’s statement that there was a bounty on his head, although not communicated to the defendant, can be considered harmless in light of the fact that it was the defendant who had provided this information to Jason. Moreover, we find that the admission of the hearsay statements made to the three witnesses— Mitchell Anderson, Melvin Noah, and Latasha Horace — was harmless in view of the other evidence adduced at trial. Ms. Horace, the victim’s fiancée, testified that after hearing gunfire, she ran to the front of the house and saw the defendant running from the area. She also found the victim, who was unable to speak. More importantly, Ms. Shezbie, who was sitting in a carport directly across the street from the victim’s house, testified that she heard gunfire, walked to the street, and saw the defendant shoot the victim. Ms. Shezbie testified that she had seen Kaleigh Smith at *691 the victim’s house on prior occasions, and she positively identified Mr. Smith, in a photographic lineup and at trial, as the man who shot the victim. Both Ms. Horace and Ms. Shezbie gave consistent accounts of the suspect’s clothing, and both knew the defendant from his prior interactions with the victim. If the State had not introduced their eyewitness testimony, and if these eyewitnesses had not known the defendant, the improperly-admitted hearsay might have affected the verdict. However, given this evidence, |21we conclude that the verdict was surely not attributable to the improperly-admitted hearsay. Moreover, the Louisiana Supreme Court has held that the cumulative effect of harmless errors does not warrant the reversal of a conviction or sentence. State v. Plaisance, 2000-1858, pp. 40-41, 811 So.2d 1172, 1199-1200 (citing State v. Strickland, 94-0025 (La.11/1/96), 683 So.2d 218, 239). Finding these evidentiary errors to be harmless, we decline to reverse the defendant’s conviction on this basis.

ASSIGNMENT OF ERROR NUMBER 2

In his second assignment, the defendant argues that the trial court improperly admitted testimony regarding his heroin use. First, the defendant claims that the admission of such evidence violated the statutory prohibition against “propensity” evidence, which demonstrates the defendant’s general bad character rather than focusing on matters relevant to his guilt. Second, the defendant contends that the prosecution’s repeated and embellished references to his heroin habit during its closing argument appealed to the jury’s prejudice and mandated the granting of a mistrial.
The record indicates that the State and defense initially agreed that the State would not introduce the defendant’s custodial statement to Detective Gernon in which the defendant admitted, in an attempt to establish an alibi, that he had gone with his brother to purchase heroin in New Orleans East on the day of the murder. During trial, however, the State apparently filed a motion under La. C.E. art. 404(B) to permit the statement to be admitted after review of the defendant’s ^telephone calls from jail revealed discrepancies in other parts of his statement relating to his clothing on the day in question, as well as his relationship with his wife at the time.[11] In any event, the record reflects that, on January 29, 2010, the State filed an amended notice under La. C.Cr.Pr. art. 768 of its intent to introduce at trial evidence of the defendant’s statement to Detective Gernon. The trial court allowed the defense to reurge its motion to suppress the statement and conducted a suppression hearing on January 27, 2010, after which it denied the motion.
Article 404(B)(1) of the Code of Evidence provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part *692 of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other crimes committed by the defendant is inadmissible due to the substantial risk of prejudice to the defendant. To admit “other crimes” evidence, the State must establish that there is an independent and relevant reason for doing so, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or that it relates to conduct that constitutes an integral part of the act. Evidence of other crimes, however, is not admissible simply to prove the bad character of the accused. Furthermore, the “other crimes” evidence must tend to prove a material fact | ^genuinely at issue, and the probative value of the extraneous crimes evidence must outweigh its prejudicial effect. State v. Tilley, 99-0569, p. 18 (La.7/6/00), 767 So.2d 6, 22.
Evidence of a defendant’s prior drug use may be admissible to show his motive for committing murder. See State v. Butler, 30,798, p. 20 (La.App. 2 Cir. 6/24/98), 714 So.2d 877, 889 (“The evidence regarding the defendant’s drug use was pertinent to establish a motive for this [murder] ... the admissibility of this evidence is dependent on the particular witness giving that evidence.”) Id. The defendant cites State v. Williams, 575 So.2d 452 (La.App. 4 Cir.1991) and State v. Sutfield, 354 So.2d 1334 (La.1978) to refute the foregoing proposition and argues that such evidence is never probative of a defendant’s intent to commit murder. Williams and Sutfield are distinguishable from the instant case, however.
In Williams, the defendant was convicted on two counts of distribution of heroin. In his opening statement, the prosecutor informed the jury that the motive for the armed robbery in that case was to obtain money to purchase narcotics. The defendant objected to the prosecutor’s cross-examination of her at trial, during which he asked her eleven times whether she used heroin, and also asked her about her acquaintance with certain individuals arrested in a recent drug sting and her self-admission to the hospital shortly thereafter. In its opinion, this court noted:
The prosecutor’s questions concerning the defendant’s use of heroin and admission to the hospital appear to have been for the sole purpose of creating an image of bad character, that is, that the defendant was a serious drug addict. The reference was not fleeting or accidental. The state made a deliberate effort to inform the jury of this information. Such a use of other crimes or acts is not admissible in evidence.
124-575 So.2d at 455. The Williams court specifically noted that such cross-examination of the defendant was impermissible under La. C.E. art. 608(B).[12] Contrary to the assertion of the defendant here, the Williams court did not hold that evidence of a defendant’s drug use or addiction is unduly prejudicial, or lacks sufficient probative value, per se. The court in Williams found that the error in allowing the prosecution’s improper questioning, coupled with “an egregiously fallacious” improper comment by the prosecutor that the defendant had posted a $100,000.00 bond without the economic ability to do so, had unduly prejudiced the jury and warranted a mistrial. Id.
*693 In Sutfield, the Louisiana Supreme Court reversed the co-defendants’ armed robbery convictions based on prosecutor’s introduction of evidence showing that they were drug addicts who had been suspected of prior armed robberies that, like the one charged, had been committed to obtain money to purchase drugs. The Supreme Court held that:
In order to have independent relevance, the ■ motive established by the other crimes must be more than a general one, such as gaining wealth, which could be the underlying basis for almost any crime; it must be a motive factually peculiar to the victim and the charged crime ... Evidence of drug addiction to show a motive for illegally obtaining funds clearly establishes only a general motive.
354 So.2d at 1337.
In the instant case, there was no evidence introduced suggesting that the defendant was a heroin junkie — only that he and his brother had gone to purchase lasheroin on the morning of the victim’s murder. Nor was this evidence the product of the prosecution’s attempt to prejudice the jury by characterizing the defendant as a “bad person” because he used drugs. Quite the opposite, it was the defendant himself who first broached the subject of his drug use in an attempt to create an alibi when interviewed by Detective Gernon. In fact, the first witness to present evidence to the jury of the defendant’s drug use was his wife, Tiffany Smith, who stated, in answer to a question posed by the defendant’s counsel, that the defendant occasionally used drugs. Consequently, unlike in Sutfield, the defense— not the State-opened the door to evidence of the defendant’s heroin use. It is well settled that where one side has gone partially into a matter on examination-in-chief, the other side may go fully into it on cross examination. State v. Edwards, 420 So.2d 663 (La.1982). Accordingly, the State was free to debunk the defendant’s alibi, as well as to use his admission of drug use as evidence of his motive for murdering the victim.
Other evidence adduced at trial established that the victim had sold drugs and that the defendant was one of his clients; that the victim had a $5,000 bounty on his head related to his involvement in the drug trade; and that the defendant had easy access to the victim through their familial contacts. The evidence therefore showed that the defendant had more than a “general motive” of financial gain. Moreover, in addition to the defendant’s statement made to Sgt. Gernon, the defendant’s brother, Ronald Dauphine, testified that he and the defendant had purchased heroin the morning of the shooting and had returned to their mother’s | chouse at around 10:30 a.m. where they remained until they learned of the victim’s death. As the victim was killed at 12:20 p.m., according to Mr. Dauphine’s account of the defendant’s whereabouts on the day of the shooting, the defendant could not be the killer. To refute this alibi testimony, the State did not focus on the issue of the defendant’s drug use. Rather, it focused on the discrepancy between whether Dau-phine and the defendant had left their mother’s house at 10:30 a.m. to purchase drugs, as Dauphine had told Detective Gernon, or whether they had returned to the house at 10:30 a.m., as Kaleigh Smith had stated. Thus, the purpose of introducing incidental evidence of the defendant’s drug use was to point out the inconsistent testimony regarding the defendant’s whereabouts at the time the crime was committed. .
The evidence of the defendant’s early morning heroin purchase on October 20, 2007 was highly probative of the defen *694 dant’s opportunity to kill the victim and of the defendant’s identity as the person who did so. For evidence to be excluded under La. C.E. art. 403, the risk of prejudice must be unfair and must substantially outweigh the probative value of the evidence sought to be introduced. State v. Fisher, 2009-1187 (La.App. 4 Cir. 5/18/10), 40 So.3d 1020, 1025-1026. In that case, this court noted:
Probative evidence is necessarily prejudicial, as it tends to establish the defendant’s guilt. Accordingly, La. C.E. art. 403 only prohibits relevant evidence whose “probative value is substantially outweighed by the danger of unfair prejudice.” (emphasis added.). Regarding the proper balancing between the probative value of evidence and its prejudicial effect required by article 403, the Louisiana Supreme Court has noted:
127Although a defendant’s prior bad acts may be relevant and otherwise admissible under ..., the court must still balance the probative value of the evidence against its prejudicial effects before the evidence can be admitted. La. C.E. art. 403. Any inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). As used in the balancing test, “prejudicial” limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)(“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.”).
State v. Rose, 2006-0402, p. 13 (La.2/22/07), 949 So.2d 1236, 1243-1244.
Based on the probative and pertinent nature of the evidence regarding the defendant’s statement to Detective Gernon, coupled with the fact that it was merely cumulative to Ronald Dauphine’s statement and Tiffany Smith’s testimony, which had been admitted at trial without objection from the defendant, we cannot say that the evidence of defendant’s drug use on the morning of the crime was improperly admitted. The probative value of this evidence was not substantially outweighed by the unfair risk that the jury would convict the defendant based solely on the evidence that he was a drug addict. We therefore conclude that the trial court did not err by admitting this evidence. We also note that, given the other evidence strongly corroborating the defendant’s guilt, the trial court’s action, even if erroneous, did not contribute to the guilty verdict and was therefore harmless.
The defendant’s second argument under this assignment is that the trial court erred by failing to declare a mistrial after the State made an allegedly improper reference to the defendant’s drug use in its closing argument.
RgLa.C.Cr.P. art. 774 limits the scope of the argument to evidence, the lack of evidence, and conclusions that may be drawn there from. It specifically warns that “[t]he argument shall not appeal to prejudice.” Additionally, La.C.Cr.P. art. 775 provides for a mistrial in a jury case when prejudicial conduct has made it impossible for the defendant to obtain a fair trial. Louisiana jurisprudence on prosecu-torial misconduct allows prosecutors wide latitude in choosing closing argument tactics. See, e.g. State v. Martin, 539 So.2d 1235, 1240 (La.1989); State v. Copeland, 530 So.2d 526, 545 (La.1988). Even assuming that remarks were inappropriate, a conviction will not be reversed due to an improper remark during closing argument *695 unless the court is thoroughly convinced that the remark influenced the jury and contributed to the verdict. Much credit should be accorded to the good sense and fair-mindedness of jurors who have seen the evidence and heard the arguments, and have been instructed by the trial judge that arguments of counsel are not evidence. State v. Kyles, 513 So.2d 265, 275-76 (La.1987).
For a mistrial to be mandatory under La.C.Cr.P. art. 770(2), a prosecutor must make reference to “other unrelated crimes as to which evidence, although admissible, has not been presented.” State v. Andrews, 527 So.2d 411, 414 (La.App. 4 Cir.1988). On the other hand, “when evidence of other crimes is admissible for any purpose, the State may argue that evidence to the jury.” Id. Notwithstanding the mandatory language of La.C.Cr.P. art. 770, an improper reference to other crimes is subject to the harmless error rule for purposes of appellate review. State v. Johnson, 94-1379 (La.11/27/95), 664 So.2d 94, 101. |29A reviewing court may declare an error harmless beyond a reasonable doubt if it finds the verdict actually rendered in the trial was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). Moreover, even when prosecutors have exceeded that latitude, courts have often criticized the improper arguments without finding that they constituted reversible error. See, e.g. State v. Byrne, 483 So.2d 564, 575 (La.1986). As discussed previously, the evidence regarding the defendant’s prior drug use was admissible and was presented at trial. Consequently, the defendant was not entitled to a mandatory mistrial under La. C.Cr.P. art. 770(2).
In support of his contention that the inflammatory nature of the State’s closing argument entitled him to a new trial under La.C.Cr. P. art. 774, the defendant argues that the State prejudiced the jury against him by characterizing him as a desperate drug addict who was willing to kill in order to support his habit. This argument is not supported by the record. It would not have been unreasonable for the jury to have inferred from evidence— properly adduced — that the defendant had a drug habit — in light of his statement that heroin, which is highly addictive, was his drug of choice. Further, he admitted that he had purchased heroin on the morning of the shooting. Moreover, that evidence was not adduced in order to appeal to the jury’s prejudice against drug users; rather, the State sought to use it to establish both the defendant’s motive for murdering the victim and his opportunity to do so. Finally, given the strength of the evidence of the defendant’s guilt — especially the identification of the defendant by two eyewitnesses who knew him |snbefore this incident — the defendant has not shown that the prosecutor’s comments were so inflammatory as to have improperly influenced the jury and contributed to the verdict. We therefore find no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER 3

In his third assignment, the defendant argues that the verdict is unconstitutional because the jury returned a non-unanimous verdict. Louisiana Constitution Article I, § 17(A) provides that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La.C.Cr.P. art. 782(A) provides, in pertinent part: “Cases in which punishment is necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
*696 In State v. Bertrand, the Louisiana Supreme Court specifically found Article 782 to be constitutional, stating:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
Id., 2008-2215, p. 8 (La.3/17/09), 6 So.3d 738, 743. This Court cited and relied on Bertrand in State v. Barbour, 2009-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, writ denied, 2010-0934 (La.11/19/10, 49 So.3d 396) cert. denied, Barbour v. Louisiana, - U.S. -, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011), to reject the argument that the Li trial court had erred in denying the defendant’s motion to declare La. C.Cr.P. art. 782(A) unconstitutional. Therefore, as confirmed by the Louisiana Supreme Court in Bertrand, under current jurisprudence from the U.S. Supreme Court, non-unanimous twelve-person jury verdicts are constitutional, and La.C.Cr.P. art. 782(A) is constitutional. We therefore find no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER 4

In his final assignment, the defendant argues that the trial court erred in denying his Motion for New Trial.
In his Motion for New Trial, the defendant proffered the call records from Ms. Cynthia Shezbie’s cell phone for February 3, 2010, as new evidence obtained through a post-trial subpoena duces tecum. He contended that the call records impeached Ms. Shezbie’s testimony that she had received a threatening phone call on that day. The absence of the call, the defendant argues, undermines confidence in her trial testimony in toto. Accordingly, he suggests that, because this new evidence proved that the State’s only eyewitness was a liar, it rendered the verdict unreliable and entitled him to a new trial.
La.C.Cr.P. Art. 851 provides in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
[[Image here]]
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or |32during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
The decision on a motion for new trial rests within the sound discretion of the trial judge, and its ruling will not be disturbed on appeal absent a clear showing of abuse. State v. Quimby, 419 So.2d 951, 959 (La.1982). The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. As a general rule, a motion for new trial will be denied unless injustice has been done. State v. Johnson, 2008-1488, p. 17 (La.App. 4 Cir. 2/10/10), 33 So.3d 328, 338.
In order to obtain a new trial based on newly discovered evidence, a de *697 fendant must show: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not due to the defendant’s lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have changed the verdict of guilty. La. C.Cr.P. art. 851(3); State v. Brisban, 2000-3437, p. 12 (La.2/26/02), 809 So.2d 923, 931; State v. Bright, 98-0398, pp. 25-26 (La.4/11/00), 776 So.2d 1134, 1149. A trial court assessing the legal merits of a motion for new trial is given considerable latitude in evaluating the impact of newly discovered evidence on the verdict. State v. Brooks, 98-0693, p. 12 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 821. The trial court has much discretion in ruling on a motion for new trial. State v. Cureaux, 98-0097, p. 4 (La.App. 4 Cir. 5/26/99), 736 So.2d 318, 321. Review of the trial court’s ruling is limited to determining whether the trial court |,^abused its discretion. State v. Labran, 97-2614, p. 6 (La.App. 4 Cir. 5/26/99), 737 So.2d 903, 907.
In State v. Johnson, 2007-2034 (La.10/9/09), 23 So.3d 878, 881, the Louisiana Supreme Court explained that the test to be employed in evaluating whether newly discovered evidence warrants a new trial is not simply whether another trier of fact might render a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial.[13] The Johnson court also held that when presented with a motion for a new trial based on newly discovered evidence, the trial judge’s duty is not to weigh the new evidence as though he were a jury determining guilt or innocence, but rather is the narrow duty of ascertaining whether there is new material fit for a new jury’s judgment.
Newly discovered evidence affecting only a witness’s credibility ordinarily will not support a motion for new trial because evidence which is “merely cumulative or impeaching” is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial. State v. Cavalier, 96-3052 and 97-0103, p. 3 (La.10/31/97), 701 So.2d 949, 951 (quoting Mesarosh v. United States, 352 U.S. 1, 9, 77 S.Ct. 1, 5,1 L.Ed.2d 1 (1956)).
In the instant case, the defendant based his motion for new trial on his post-verdict receipt of Ms. Shezbie’s telephone records showing all incoming and l^outgoing calls from her cell phone from 7:01 a.m. to 11:58 p.m. on February 3, 2010, the date on which, according to her testimony, she had received a call from someone she believed to be the defendant’s friend. She stated that she believed the person who called her was incarcerated in Orleans Parish Prison and was using a cell phone. After breaking down each call in an attempt to show that none of the numbers listed could have been threatening in nature, the defense counsel argued that this new evidence proved that Ms. Shez-bie’s testimony as to the threatening phone call was false. He further argued that because Ms. Shezbie had once recanted her testimony, this evidence would have cast serious doubt in the jury’s mind regarding whether she had recanted because of threats against her and her family, as *698 she maintained, or because of her honest belief in the defendant’s innocence. Moreover, the defendant argues, the evidence would have prompted the jury to question the veracity and reliability of Ms. Shezbie’s entire testimony, thereby discrediting the State’s eyewitness and rendering its case legally insufficient to convict.
Pretermitting the issue of whether the proffered evidence could be considered “newly discovered” for purposes of La. C.Cr.P. art. 851(3), we find it was legally insufficient to entitle the defendant to a new trial. First, Ms. Shezbie’s cell phone records do not establish that her trial testimony was false. The records are of questionable reliability because they do not reflect a full seven hours of potential calls between the hours of midnight and 7:01 a.m. on February 3rd. Moreover, the unreliability of these records was evidenced by a discrepancy |3sbetween the calls shown therein and those shown on the incoming call log on Ms. Shezbie’s cell phone, which was dissected on the record at trial. The transcript of Ms. Shezbie’s cross-examination indicates that her phone received an incoming call at 11:02 p.m. on February 3rd. However, no such call is listed on the proffered call records; rather, only an outbound call, lasting zero seconds, is listed at 11:01 p.m. While it is possible to alter one’s log by deleting actual calls out of existence, it is seemingly impossible to artificially invent calls that were, in fact, never made. That Ms. Shez-bie’s phone reflected an incoming call at 11:02 p.m. on February 3rd was not disputed by the defense, and it could support her assertion that she received a threatening call the day before her testimony. The absence of this call from the proffered call records casts doubt upon the reliability of those records for purposes of impeaching her credibility.
Additionally, the defendant posits without support that it would be “inconceivable” that Ms. Shezbie would return the call of a person who had just threatened her. Ms. Shezbie testified the caller had “[a]sk[ed] me please do not come in here [to court].” To argue that she would not have returned the call is pure speculation. Either way, the State did not have the burden to defend Ms. Shezbie’s decision to call back a number from which she had just received a request not to testify. It was the defendant’s burden to prove that the proffered call records rendered Ms. Shezbie’s testimony to be false, which he failed to do.
Further supporting Ms. Shezbie’s claims to have received threatening communications from the defendant’s associates was the State’s production of Ms. 13nShezbie’s otherwise confidential victim/witness file, which offered documentary proof that more than two years prior to trial, Ms. Shezbie had communicated to the District Attorney’s Office that “friends of the defendant h[ad] threatened members of [her] family.” Even in the absence of proof that she had received a threatening call on February 3, 2010, sufficient evidence existed to support Ms. Shezbie’s claim that her initial decision to recant was caused by threats against her and her family made on behalf the defendant. The defendant’s new evidence therefore would not have served to undermine Ms. Shezbie’s credibility to the extent necessary to render the verdict unreliable.
Finally, considering that the totality of the State’s evidence corroborated Ms. Shezbie’s testimony regarding the events surrounding the victim’s murder — including the proffered call records — the defendant cannot demonstrate a reasonable probability that the jury would have reached a different verdict. Ms. Shezbie’s account of the murder was consistent, un- *699 controverted, and supported by the physical evidence presented through the testimony of Dr. McGarry. Her description of the defendant and his flight from the scene of the shooting were corroborated by Ms. Latasha Horace, who further testified that the victim had gone to meet the defendant moments before he was killed. Further, Detective Carter’s testimony also corroborated Ms. Shezbie’s testimony. Both Ms. Shezbie and Ms. Horace were previously acquainted with the defendant, and both positively identified the defendant to police and at trial. Considering the trial testimony, Ms. |S7Shezbie’s recantation two days before trial was reasonably discounted by the jury in light of her testimony that she was afraid.[14]
Accordingly, we conclude that the trial court did not abuse its discretion in denying the defendant’s motion for a new trial given that the cell phone records proffered by the defendant did not demonstrate that Ms. Shezbie’s testimony about having received a threatening phone call was false. The defendant has not demonstrated that the cell phone records would have impeached Ms. Shezbie’s testimony to the extent necessary to undermine confidence in the jury’s verdict. The evidence at trial corroborated Ms. Shezbie’s testimony that she witnessed the defendant shoot the victim at 12:20 p.m. on October 20, 2007. The defendant therefore has failed to show that the introduction of the proffered cell phone records at trial “would [have] so devastate^] the credibility of Ms. Shez-bie’s testimony that the jurors ... probably would have reached a different result.”
We therefore conclude that the trial court did not abuse its discretion by denying the defendant’s motion for new trial.
CONCLUSION
Accordingly, for the reasons stated, the defendant’s conviction and sentence are affirmed.
AFFIRMED
JONES, C.J., concurs in the result.

. Ms. Horace testified that two young men she did not recognize brought the phone to her door sometime after Jason was shot. She was not allowed to testify as to what the young men told her because it was objected to as hearsay.

. The State and defense stipulated that NOPD Criminalist, Ms. Jody Clements, was an expert in serology. Further, the parties stipulated that if Ms. Clements were called to testify, she would testify that she had tested the two shirts in evidence, and that the testing on both shirts was negative for the presence of blood.

. Due to the unavailability of Det. Carter, the parties stipulated that his testimony would be in the form of a transcript from a motion hearing on April 17, 2008.

. Officer Kathy Robertson of the NOPD 911 Communications Office, the custodian of 911 records, identified a copy of the computer incident recall sheet showing the 911 call made by Ms. Shezbie. The recall sheet indicates the location of the incident, the signal, the time and date, and any information supplied by caller(s). The State and defense stipulated to the introduction into evidence of the audio recording of the 9-1-1 call.

. The evidence showed that the victim had $460.00 in his pocket at the time he died.

. The State and the defense stipulated to the admission into evidence of the phone log. The log indicates that Kaleigh Smith's cell phone number appeared in the victim’s cell phone directory, but it does not show any calls received from that number on the day of the shooting.

. “Mike” is not identified in the record.

. Ms. Kimberly Denison, a staff investigator at the New Orleans Public Defender's Office, testified that, in anticipation of trial, she had taken photographs and measurements at 8723 Gervais Street, the house in which Latasha Horace had lived on the day of the shooting.
She identified several photographs of the general vicinity of the crime scene taken by her from the window where, according to Ms. Horace's testimony, she had been standing when she had observed the defendant running away from the scene of the shooting. Ms. Denison acknowledged that she had been unable to take a full range of pictures from the window because a bed and another piece of furniture had blocked her access to one side of the window. She further testified that she had never visited the house when Ms. Horace had lived there and did not know how the furniture had been arranged then.

. Although a statement not introduced to prove the matter asserted therein is technically not hearsay, in many cases the courts have analyzed these statements in the same manner as those introduced for the purpose of proving the matter asserted.

. The defendant alternatively argues that the statements are inadmissible because they are *690 "testimonial” in nature, and their admission violated his rights under the Sixth Amendment to the U.S. Constitution, the Confrontation Clause. See Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In light of our conclusion that the statements are inadmissible pursuant to La C.E. art. 803(3), we pretermit consideration of defendant's alternative argument.

. The defendant notes in his brief that the State filed a "Motion to Introduce Alleged Drug Use by the Defendant” under La. C.E. art. 404(B); however, the record does not contain such a motion.

. La. C.E. art. 608(B) provides:
Particular acts, vices, or courses of conduct of a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.

. Materiality was defined in U.S. v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985): "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability' is a probability sufficient to undermine confidence in the outcome.” See State v. Phillips, 92-1063 (La.App. 4 Cir. 2/29/96), 670 So.2d 588.

. Recantations are highly suspicious and, except in rare circumstances, a motion for new trial should not be granted on the basis of a recantation. State v. Clayton, 427 So.2d 827, 832-33 (La.1982).