PAUL A. BONIN, Judge.
_JjThe defendants, Joseph Norah and Sean Watts, were found guilty by a jury of the attempted second degree murder of Dayshawn Brown. Following their trial, Mr. Norah was adjudicated a fourth felony offender under La. R.S. 15:529.1, and Mr. Watts admitted to being a second felony offender. Both defendants appeal their convictions, and Mr. Norah appeals his sentence of forty-nine and three-fourths years.
Their first jointly-raised assignment of error contends that the record is too incomplete to afford constitutionally-sufficient judicial review of their appeal due to the missing portions of the testimony of a police officer. We find that the defendants have not shown that they have suffered any reasonable likelihood of prejudice from the missing portions of the officer’s testimony, and that we may proceed with a full review of their other assignments of error.
The defendants argue that their Due Process rights were violated by the trial judge’s denial of their pretrial motion to suppress the out-of-court identifications by Mr. Brown. Both defendants were identified by Mr. Brown during suggestive |2show-up procedures on the ramp of the *179 hospital where Mr. Brown sought emergency medical treatment. We find that the trial judge did not abuse his discretion in finding that the defendants did not establish the unreliability of Mr. Brown’s out-of-court identifications, and, on that account, their rights to Due Process were not violated by the suggestive show-up procedures.
The defendants together claim that their rights under the Confrontation Clause were violated by the admission into evidence of the recordings of 9-1-1 telephone calls regarding a different shooting in which the shooter’s clothes were described and a red Monte Carlo vehicle was seen fleeing the scene. Because we find that the statements made during the 9-1-1 calls were not testimonial, the trial judge did not abuse his discretion in admitting the calls. Mr. Norah similarly claims that his right under the Confrontation Clause was violated by the admission into evidence of the recordings of jailhouse telephone calls made by his co-defendant, Mr. Watts, which seemingly implicated Mr. Norah in the shooting of Mr. Brown. Because we find that Mr. Watts’ jailhouse calls were also not testimonial evidence, we conclude that the trial judge did not abuse his discretion in admitting those calls.
The defendants together argue that the trial court erred in admitting into evidence 9-1-1 calls from and testimony regarding another shooting. Because we find that the evidence was admissible under La. C.E. art. 404 B(l) as conduct that constitutes an integral part of the act or transaction that was the subject of the trial, we hold that the trial judge did not abuse his discretion.
|sThe defendants also argue that the recordings and transcripts of the jailhouse calls made by the defendants were inadmissible because the prosecution did not properly authenticate the evidence. The prosecution was required to demonstrate to the satisfaction of the trial judge under La. C.E. art. 104 A that the jailhouse calls were shown to be made by the defendants under the authenticity standard established by La. C.E. art. 901 A. Based upon testimony provided during the trial, we conclude that the trial judge did not abuse his discretion in finding that the jailhouse calls had been sufficiently authenticated for the purposes of admissibility.
The defendants, in their last joint assignment of error, argue that the prosecutor’s comments during his closing rebuttal argument were so prejudicial that the trial judge should have declared a mistrial. Here, the prosecutor’s argument certainly went outside of the bounds of proper argument, but the trial judge properly admonished him in the presence of the jury. Because we are unconvinced that the prosecutor’s improper argument contributed to the jury’s verdict, we conclude that the trial judge did not abuse his discretion in denying their motion for mistrial after finding that the defendants’ ability to obtain a fair trial was not impaired.
Mr. Norah argues that a less-than-unanimous jury convicted him in violation of his rights under the Sixth and Fourteenth Amendments. As we have often held, he is not entitled to relief on this claim.[1] Finally, believing that the legislatively-[mandated4 minimum sentence was twenty years, Mr. Norah argues that his sentence of forty-nine and three-fourths years was excessive. We note that his sentence, *180 which the prosecution has not appealed, is three months short of the legislatively-mandated fifty-year minimum sentence for this matter. Because Mr. Norah suggests no basis for further deviation below the fifty-year minimum, we affirm his sentence.
Thus, after our review of the defendants’ assignments of error as well as our review for errors patent,[2] we affirm the convictions of both defendants and the sentence of Mr. Norah. We explain our decision in the following Parts.
I
In this Part, we provide the factual background which gave rise to these criminal proceedings. At roughly 4 A.M. on April 19, 2010, Mr. Brown drove to Gene’s Po-Boys near the corner of St. Claude Avenue and Elysian Fields Avenue. As he pulled up in front of the Walgreen’s store on the opposite side of St. Claude, he noticed an argument occurring between the defendants and three women in front of the po-boy shop. In an effort to avoid this altercation, Mr. Brown parked, and decided to wait to enter the store. Mr. Brown passed this time by speaking on the phone with his cousin.
| r,Detective Krister Vilen, in his testimony at trial, estimated that Mr. Brown viewed the defendants from roughly fifty to sixty feet away. Mr. Brown also testified that, despite not knowing the men and viewing them in the middle of the night, the streetlamp and storefront lighting illuminated the area such that he could clearly see the defendants’ faces, hairstyles, and clothing. Mr. Brown stated that Mr. Watts was wearing white jeans, a white dress shirt, and white shoes, while Mr. Norah was wearing blue jeans and a white t-shirt. Mr. Brown also noted that one man was “bald-headed,” while the other had a “bald fade” haircut.
Mr. Brown then heard one of the defendants shout that he thought Mr. Brown was calling the police. At that moment, the ongoing altercation ceased, and the defendants got into their red Chevrolet Monte Carlo, and oriented the vehicle such that they were facing the same direction on St. Claude as Mr. Brown’s parked car. Mr. Brown, alarmed by this, drove off eventually stopping at the red light governing the intersection of Elysian Fields and North Claiborne Avenue. Mr. Brown testified that the red Monte Carlo driven by the defendants followed him to that intersection. As the red Monte Carlo approached Mr. Brown’s stopped vehicle, Mr. Brown heard multiple “pops.” Mr. Brown was shot once through his nose and twice in his head — where one bullet still remains — and immediately drove himself to University Hospital.
Before these events, at roughly 3:15 A.M., Officer George Chenevert was dispatched to a separate shooting at The Duck Off, a nightclub located at 2304 A.P. Tureaud Avenue. A 9-1-1 caller stated that a red Monte Carlo vehicle without a | (license plate was seen fleeing the scene, and Officer Chenevert responded by searching the surrounding neighborhood for that vehicle. After briefly diverting to another call, Officer Chenevert went to the scene of the shooting. While there, Officer Chenevert observed a red Monte Carlo travelling slowly past the scene of the *181 crime, and ran to his patrol car in order to pursue and locate that vehicle.
Officer Chenevert then engaged in a high-speed pursuit, which ended at the 1600 block of Governor Nicholls Street. The defendants fled from their vehicle into a nearby apartment complex. Officer Chenevert, along with several other officers and after being granted permission to search the premises, eventually located the defendants in a bedroom in Kim Powell’s apartment.
Detective Vilen arrived at Ms. Powell’s apartment about 4:30 A.M. The police conducted searches of Ms. Powell’s residence and the red Monte Carlo during which a white tank top, a pair of white and brown shoes, and two white dress shirts were discovered. Detective Vilen then drove to University Hospital to take a statement from Mr. Brown. Detective Vilen noted, and Mr. Brown confirmed at trial, that Mr. Brown was conscious and alert despite the hospital administering morphine for his pain earlier that morning. After taking Mr. Brown’s statement, Detective Vilen decided to see if Mr. Brown could identify the defendants through show-up identifications. Out of concern for Mr. Brown’s health, the detectives chose to perform the identifications at the hospital.
The show-up identifications took place at roughly 8 A.M., slightly less than four hours after the shooting. While transporting Mr. Brown in a wheelchair from |7his seventh floor hospital room to a separate waiting area with tinted external glass on the first floor of the hospital, Detective Vilen told Mr. Brown that he wanted Mr. Brown to take a look at some recently arrested suspects, who fit his descriptions and had run from police in a red Mote Carlo.
The defendants were also driven to the hospital at this time. Detective Vilen testified that Mr. Brown could not see the police cars from which the defendants exited; Mr. Brown, however, contradicted this in his testimony. A uniformed officer then individually escorted each defendant, handcuffed, up the loading ramp at the rear of the hospital. Mr. Watts was wearing only white denim jeans and white shoes; while Mr. Norah was wearing a white, crew neck t-shirt and blue jeans without any shoes. Mr. Brown viewed both men, and positively identified them— Mr. Watts as the passenger and shooter, and Mr. Norah as the driver. Detective Vilen testified that it was well-lit outside during Mr. Brown’s identifications.
The defendants were then driven back to the station, formally arrested, charged with Attempted Second Degree Murder, and Mirandized. During interrogation, Mr. Watts admitted to driving around The Duck Off that evening. The defendants were then transported to Orleans Parish Prison where they made several recorded phone calls.
In June of 2011, Mr. Norah and Mr. Watts were tried jointly, and both were convicted of Attempted Second Degree Murder by a jury.
J#
In this Part, we explain why we find that we can conduct a full constitutional review of the defendants’ other assignments of error despite the missing portions of Officer Chenevert’s trial testimony. The defendants, in this case, have failed to show how the omission of material testimony prejudiced their efforts to substantiate their other assignments of error.
A
A criminal defendant has a constitutional right of appeal or review as to questions of law. See La. Const, art. V, § 10. Moreover, “[n]o person shall be subjected *182 to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.” La. Const. art. I, § 19. See also Hardy v. U.S., 375 U.S. 277, 279-282, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964); State v. Ford, 338 So.2d 107, 110 (La.1976). In order to provide a complete record, court-reporters are required to record criminal proceedings, including the testimony of witnesses, and transcribe portions of those proceedings when necessary. See La. R.S. 13:961 C(1); La.C.Cr.P. art. 843.
The purpose of recording criminal proceedings is to provide accurate documentation of what occurred at trial so that the defendant or the prosecution can support their assignments of error for appellate review and we can review for errors patent on the face of the record pursuant to La.C.Cr.P. art 920. See State v. Robinson, 387 So.2d 1143, 1144 (La.1980). See also State v. Pierce, 11-0095, p. 3 (La.App. 4 Cir. 8/31/11), 89 So.3d 1, 3 (citing Ford, 338 So.2d at 110) (“Without a complete record from which a transcript for appeal may be prepared, a defendant’s right of appellate review is rendered meaningless.”). The ordinary and primary remedy for a violation of this right is remand to the lower court for a new, fully-recorded trial. See id.; State v. Milanez, 09-1396, p. 3 (La.App. 4 Cir. 12/16/09), 28 So.3d 523, 525.
But, as here, where only a small portion of the overall testimony is missing, we must first examine the available record, and decide whether the record “is so inadequate that the defendant’s constitutional right to judicial review is prejudiced.” State v. Boatner, 03-0485, p. 6 (La.12/3/03), 861 So.2d 149, 153. We come to this determination through a two-part analysis for materiality and prejudice, and will only remand for a new trial when both elements are satisfied.
First, we determine the materiality of the omission, which varies depending on the legal bases of the defendant’s assignments of error, the missing portions’ relevance in relation to those assignments, and our ability to properly review those assignments in the absence of that portion of the record. See id., 03-0485 at p. 4, 861 So.2d at 153. Thus “[a] slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal does not require reversal of a conviction.” State v. LaCaze, 99-0584, p. 17 (La.1/25/02), 824 So.2d 1063, 1076 (citing State v. Brumfield, 96-2667, pp. 15-16 (La.10/20/98), 737 So.2d 660, 669) (internal quotations omitted). See also State v. Stukes, 08-1217, p. 23 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1248.
| mSecond, the defendant must show a “reasonable likelihood that he suffered prejudice” from that material omission in substantiating his other assignments of error. Boatner, 03-0485 at pp. 5-6, 861 So.2d at 153. See, e.g., State v. Allen, 99-2358, pp. 6-7 (La.App. 4 Cir. 3/21/01), 788 So.2d 62, 66.
B
Here, a short in the courtroom’s electrical system caused the court-reporter’s stenographic machine and its backup recording system to fail to document the ending part of the prosecution’s direct examination of Officer Chenevert as well as the beginning part of Mr. Watts’ counsel’s subsequent cross-examination. The testimony of Officer Chenevert, while certainly important, related to the shooting at The Duck Off nightclub and the ensuing capture of the defendants. Officer Chenevert did not investigate the shooting of Mr. Brown, nor was he involved in Mr. Brown’s out-of-court show-up identifications of each defendant.
*183 Thus, Officer Chenevert’s testimony only pertained to the defendants’ assignment of error asserting that the trial court abused its discretion by allowing the introduction of the recordings of the 9-1-1 emergency calls, and the full exposition to the jury about the other shooting that night at The Duck Off nightclub, which we treat in Part V, post. The defendants’ complaint in that assignment of error is limited to the prejudicial effect that the introduction of such evidence may have had. As to that assignment concerning prejudice, Officer Chenevert’s testimony is surely material.
|n Despite the materiality of the missing content of Officer Chenevert’s testimony, the defendants have failed to show that they were prejudiced through an inability on our part to review their assignments of error. We have examined Officer Chene-vert’s testimony, and find that the portion which was preserved on the record is extensive. The defendants have not claimed that there was information in the missing portions of his testimony that is not contained elsewhere in the record.
The content of Officer Chenevert’s testimony regarding the shooting at The Duck Off can be gleaned from other recorded portions of his testimony. Officer Chene-vert’s initial testimony regarding the matter during direct examination is recorded. Additionally, portions of Mr. Watts’ counsel’s cross-examination and the entirety .of Mr. Norah’s counsel’s cross-examination regarding the matter are recorded as well.
Therefore, under the appropriate two-step analysis for determining whether the record is inadequate for us to afford the defendants full judicial review of their assigned errors, we find that the missing portion of the testimony is material but does not result in any prejudice to the defendants’ right to judicial review.
III
In this Part, the defendants contend that the trial court erred in denying their motion to suppress Mr. Brown’s out-of-court identifications. We disagree and find that the trial judge did not abuse his discretion in denying their motion to suppress, [12because, while the police used a suggestive “show-up” identification procedure, it did not create a substantial likelihood of misidentifieation by Mr. Brown.
A
We review a trial court’s determination on the admissibility of an out-of-court identification and its subsequent denial of a motion to suppress for abuse-of-discretion. See State v. Brown, 09-0884, p. 8 (La.App. 4 Cir. 3/31/10), 36 So.3d 974, 978; State v. Bickham, 404 So.2d 929, 934 (La.1981). Our review is not limited in scope to the evidence introduced at the hearing on the motion to suppress; rather, our consideration extends to all pertinent evidence adduced at trial. See State v. Chopin, 372 So.2d 1222, 1224 n. 2 (La.1979); State v. Williams, 572 So.2d 756, 757 (La.App. 4th Cir.1990).
The Fifth and Fourteenth Amendments to the United States Constitution strive to protect defendants from unreliable evidence in criminal proceedings through the provision of rights and resources that function to persuade juries that such evidence is untrustworthy. “Only when evidence ‘is so extremely unfair that its admission violates the fundamental conceptions of justice,’ have we imposed a constraint [on the evidence’s admission] tied to the Due Process Clause.” Perry v. New Hampshire, _ U.S. _, 132 S.Ct. 716, 723, 181 L.Ed.2d 694 (2012) (quoting Dowling v. United States, 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)).
*184 The defendants bear the burden of proof in their motion to suppress this out-of-court identification. See La.C.Cr.P. art. 703. See, e.g., State v. Thibodeaux, 98-1673, p. 20 (La.9/8/99), 750 So.2d 916, 932; Brown, 09-0884 at p. 4. 36 So.3d at 978 (citing State v. Stovall, 07-0343, p. 16 (La.App. 4 Cir. 2/6/08), 977 So.2d 1074, 1084). To prevail on such a motion, a defendant must show that the identification procedure in question was suggestive, See Manson v. Brathwaite, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Simmons v. United States, 390 U.S. 377, 384-385, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), and that the procedure created a substantial likelihood of misidentification such that defendant was denied due process of law. See Neil v. Biggers, 409 U.S. 188, 196, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. Prudholm, 446 So.2d 729, 738 (La.1984).
In proving suggestiveness, a defendant is attempting to show that the police’s conduct in organizing and administering the identification was improper. See Perry, 132 S.Ct. at 724. We have long-held that an identification is suggestive if the witness’ attention is “unduly focused” on the defendant. See Brown, 09-0884 at p. 5, 36 So.3d at 979; State v. Robinson, 386 So.2d 1374, 1377 (La.1980).
Suggestiveness of an out-of-court identification alone, however, does not necessitate suppression. See Perry, 132 S.Ct. at 724. A per se rule governing the suppression of suggestive identifications would unnecessarily exclude reliable and relevant evidence from the jury’s consideration, and focus only on the deterrence of particular police conduct. See id.
“[T]he Due Process Clause requires courts to assess, on a case-by-case basis, whether improper police conduct created a ‘substantial likelihood of misiden-tification.’ ” Id. In making this determination, the court should look to the totality of the circumstances, See Manson, 432 U.S. at 106, 97 S.Ct. 2243, and assess the reliability of each identification. See Perry, 132 S.Ct. at 724-725. The U.S. Supreme Court in Biggers provided factors to examine in this determination: “the opportunity of the witness to view the criminal at the time of the crime, the accuracy of the witness’ prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.” 409 U.S. at 199-200, 93 S.Ct. 375. “Against these factors is to be weighed the corrupting effect of the suggestive identification itself.” Manson, 432 U.S. at 114, 97 S.Ct. 2243. Should a court find that a suggestive identification created a substantial likelihood of misidentification, it should exclude the evidence from the jury’s consideration at trial.
B
Mr. Brown identified the defendants through a procedure known as a “one-on-one show-up.” This is “an identification procedure ... whereby a victim is asked whether the victim recognizes the person suspected to be the perpetrator of a crime against the victim.” State v. Harold, 03-0649, p. 6 n. 2 (La.App. 4 Cir. 11/12/03), 861 So.2d 262, 265. “This type of identification differs from identification through a photo line-up or a physical line-up, because only one individual is presented to the victim for identification.” Id.
A show up, without more, is not suggestive per se. See State v. Tapp, 99-2279, p. 14 (La.App. 4 Cir. 5/30/01), 788 So.2d 1215, 1225. These procedures, however, are not favored by law, see State v. Dunbar, 356 So.2d 956, 962 (La.1978), but are permissible when close in proximity to the crime’s occurrence. See Stovall, 07-0343 at p. 17, 977 So.2d at 1085; State v. *185 Felton, 03-0548, p. 4 (La.App. 4 Cir. 10/8/03), 859 So.2d 817, 819.
There is no question that Mr. Brown identified the defendants during a suggestive identification procedure. Detective Vilen and Mr. Brown both testified about this procedure extensively. As stated in Part I, ante, Mr. Brown was transported by Detective Vilen to a separate waiting area on the first floor of University Hospital, which had a tinted window looking out onto a loading ramp. While moving Mr. Brown to the waiting area, Detective Vilen told Mr. Brown that the defendants fit his descriptions, and that they had fled from the police in a red Monte Carlo. A police officer then walked each defendant up the ramp individually, while handcuffed. The defendants were in various states of dress — Mr. Watts was shirtless, and Mr. Norah shoeless. Mr. Brown then positively identified each man.
The procedure utilized alone was very suggestive, and Detective Vilen’s commentary to Mr. Brown about the defendants makes this procedure highly suggestive. Notably, Detective Vilen admitted that these statements are not usually permitted prior to an identification. Mr. Brown confirmed the influence that these statements had when he testified that he thought that the defendants were likely the perpetrators because they ran from the police. The defendants met their burden of showing that this procedure was suggestive.
|1ñThis suggestive identification procedure, however, did not create a substantial likelihood of misidentification such that it violated the defendants’ due process rights. In making this determination, we consider the Biggers factors.
First, Mr. Brown testified that he had ample opportunity to view the defendants prior to the crime occurring. He was parked roughly fifty to sixty feet away from where the defendants were standing. Both men were standing under bright lighting. Mr. Brown’s attention was drawn to the defendants as they were part on an ongoing altercation. Mr. Brown had ample opportunity to see the defendants’ faces, clothing, and hairstyles prior to the shooting.
Second, Mr. Brown then provided this description to Detective Vilen in his statement at the hospital. Detective Vilen felt that his description of the defendants was sufficiently thorough to justify performing a “show-up” identification. Finally, roughly four hours after the shooting, Mr. Brown positively identified the men, and provided their respective roles in his attempted murder.
In weighing these factors against cor-ruptive effect of the suggestive identification procedure, we find that Mr. Brown’s identification of the defendants was still reliable, and that there was not a substantial likelihood of misidentification. Accordingly, the trial court did not abuse its discretion in denying the defendants’ motion to suppress. We reject this assignment of error.
IV
The defendants contend that the trial court, in admitting the recordings of the 9-1-1 telephone calls from The Duck Off shooting, violated their rights under the 1 ^Confrontation Clause. The defendants claim that the 9-1-1 callers, who identified the red Monte Carlo and the clothes of the person chasing after the victim, should have testified at trial. Because the statements made during the 9-1-1 calls were not testimonial, they are beyond the scope and protection of the Confrontation Clause.
Mr. Norah also asserts that the trial judge erred in admitting into evidence the recordings of jailhouse calls made by Mr. *186 Norah’s co-defendant, Mr. Watts, at their joint trial. Mr. Norah asserts that the admission of this evidence violated his right under the Confrontation Clause as explicated in Bruton v. U.S., 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We disagree, and hold that Mr. Watts’ recorded statements were also not testimonial. Thus, the procedural protections of the Confrontation Clause do not apply.
A
The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” U.S. Const, amend VI. This right extends to state criminal prosecutions through the Fourteenth Amendment. See Pointer v. Texas, 380 U.S. 400, 406, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).
“[T]he principal evil at which the Confrontation Clause is directed was the civil-law mode of criminal procedure, and particularly its use of ex paHe examinations as evidence against the accused [at trial].” Crawford v. Washington, 541 U.S. 36, 50, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). As a result, “[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability [of the |iswitness to testify at trial] and a prior opportunity for [the defendant to] cross-examin[e the witness].” Id. at 68, 124 S.Ct. 1354.
The contours of the Confrontation Clause’s relevance in the inclusion or exclusion of certain hearsay statements at trial are defined by the term “witness” in its text. Id. at 51, 124 S.Ct. 1354. A “witness” is one who “bears testimony.” Id. “Testimony” is “a solemn declaration or affirmation made for the purpose of establishing or proving some fact.” Id. (internal punctuation omitted). Thus, a statement must be “testimonial” in nature for the procedural protections set forth in Crawford to apply. Whether a statement is “testimonial” has proven to be jurispru-dentially enigmatic. The U.S. Supreme Court has abstained from too rigidly defining the parameters of this term, utilizing instead a fluid, situational approach.
In Crawford, the Supreme Court set forth a “core class of testimonial’ statements,” that included “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” Id. at 52, 124 S.Ct. 1354. The Court then found that “[statements taken by police officers in the course of interrogations are ... testimonial” under this standard. Id.
In Davis v. Washington, the Supreme Court clarified when police interrogation produces testimonial statements to include those “solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator.” 547 U.S. 813, 826, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court found a wife’s statements in response to a 9-1-1 operator’s questions regarding an ongoing |19domestic abuse incident to be “non-testimonial” since her statements intended to “describe current circumstances requiring police assistance.” See Id. at 827, 126 S.Ct. 2266. The Supreme Court was specific to note, however, that this did not universally exempt 9-1-1 call recordings from exclusion under the Confrontation Clause. See Id. at 828, 126 S.Ct. 2266.
Then, the Court in Hammon v. Indiana, consolidated with Davis, found a victim’s affidavit to be testimonial when the victim’s statements were in response to police questioning about a domestic abuse incident that could no longer be objectively *187 described as an ongoing emergency. See 547 U.S. 813, 829-830, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court found that the use of an affidavit was sufficiently formal to be testimonial as it functioned as “an obvious substitute for live testimony, because [the statements in the affidavit] do precisely what a witness does on direct examination.” Id. at 830, 126 S.Ct. 2266.
Finally, in Michigan v. Bryant, the Court provided a framework to assist lower courts in determining whether a statement qualifies as testimonial. See _ U.S. _, 131 S.Ct. 1143, 1150, 179 L.Ed.2d 93 (2011) (citing Davis, 547 U.S. at 822, 126 S.Ct. 2266).[3] The Court emphasized that “the relevant inquiry is ... the purpose that reasonable participants would have had, as ascertained from the individuals’ statements and actions and the circumstances in which the encounter occurred.” Id. at 1156. The Court then set forth a three-part inquiry.
| snFirst, we must determine whether there was an “ongoing emergency.” This is a “highly context-dependent inquiry.” Id. at 1158. Crimes, such as aggravated assault and murder, have much broader “zones of danger” which can extend to the public-at-large and the police. Id. The scope and duration of an “ongoing emergency” can also fluctuate based on consideration of a number of factors, including the type of weapon used in the crime, and the extent and nature of the victim’s injuries. In Bryant, the Court found that the police were objectively reasonable in perceiving the situation as an ongoing emergency with possible significant danger to the public and themselves. See id. at 1158-1159. The existence vel non of an ongoing emergency, however, is not dispositive of whether a statement is testimonial. See id. at 1165.
Second, we should consider the formality of the interrogation. See id. at 1166. More formal interrogations are generally indicative of non-emergency situations, and “testimonial” statements being given. See id. at 1160.
Third, we should determine the “primary purpose” of the interrogation through examining the statements and actions of both the declarant and the interrogator. See id. at 1162. This inquiry examines both parties as reasonable actors in their actual circumstances, including the severity of the victim’s injuries. See id. For example, in Bryant, when the police approached the victim, they simply asked, “What happened?” This question, along with the victim’s response providing the factual background of the shooting as well as the identity of his |2ishooter, were objectively reasonable in the context of that ongoing emergency. See id. at 1163.
B
1
At trial, the prosecution introduced the recordings of 9-1-1 calls from three different individuals regarding the shooting at The Duck Off. The first caller began by stating where the shooting had occurred. The operator then questioned the man about the number of shots fired, and the well-being, location, and description of the victim of the shooting. The caller answered these questions, and stated that a red Monte Carlo with no license plate sped off from the area driving toward Claiborne.
*188 The second caller spoke with the operator during three separate calls. The caller stated that she saw a man chasing after the victim, and, in response to a question from the operator, provided as description of the shooter’s clothing — a white t-shirt and jeans. During the last of the three calls, the caller is now in a vehicle driving the victim to Tulane Hospital. The operator asks for the victim’s name, race, and age, as well as a description of the ear that they are driving, the identity of the shooter, and whether anyone else was shot. The caller asks the victim these questions, and provides his answers to the operator.
The final caller reports a shooting, and the operator asks for the number of shots fired and what the shooter was wearing. The caller provides this information as well as that the victim was shot in the side of his chest, and left his truck doors wide open when he was fleeing the shooting.
122^
The defendants assert that their rights under the Confrontation Clause were violated when these persons that dialed 9-1-1 and identified the red Monte Carlo and the perpetrator’s clothing were not called to testify, and, thus, were not subjected to cross-examination. The statements on the recordings of the 9-1-1 calls are “non-testimonial,” and were made “to enable police assistance to meet an ongoing emergency.” Bryant, 131 S.Ct. at 1150 (citing Davis, 547 U.S. at 822, 126 S.Ct. 2266). Thus, they are not protected by the Confrontation Clause. In reviewing the defendants’ claims, we follow the framework set forth in Bryant.
First, the situation surrounding the shooting at The Duck Off qualifies as an “ongoing emergency.” A shooting is a crime that, by its nature, the police can objectively assume carries one of the greatest risks to the victim, the public, and themselves in responding to the incident. In this case, a man was shot in public with no indication to the police that the situation had calmed, or that the shooter had surrendered. The police also had no knowledge of the whereabouts or the motive of the shooter. The police were objectively reasonable to treat this situation as an ongoing emergency. Our factual scenario is similar to what occurred in Bryant — a man was shot, a shooter was at-large with a gun, and the injuries to the victim were serious. See id. at 1158.
Second, the police interrogations during the 9-1-1 calls were informal. Similar to Bryant, the questioning occurred in the immediate aftermath of a shooting, in public, and prior to the arrival of emergency medical services or the | ^police. See id. at 1160. This was not, by any means, a formal interrogation. The questions asked by the operator related to the well-being and location of the victim as well as the whereabouts and identity of the shooter. Additionally, this situation is more similar factually to Davis than Hammon. The calls to 9-1-1 came while there was still potential danger to the victim and bystanders that the perpetrator could return to the scene.
Third, the 9-1-1 operator’s questions were objectively reasonable as part of the police’s response to this ongoing emergency. Asking callers about the whereabouts of the shooter and the clothing of an active shooter are objectively reasonable responses in the callers’ efforts to enable police assistance to meet an ongoing emergency.
The statements contained in the recordings of the 9-1-1 calls were “non-testimonial.” The Confrontation Clause of the Sixth Amendment does not provide procedural protection against the admission of such statements.
*189 c
Mr. Norah claims that the trial judge, when he admitted the statements contained in the recordings of Mr. Watts’ jailhouse calls, violated his right under the Confrontation Clause as explicated in Bru-ton. We find that Mr. Watts’ statements were “non-testimonial” in nature, and, thus, the procedural protections set forth in Bruton do not apply.
I24I
In Bruton, the U.S. Supreme Court held that the admission of a non-testifying co-defendant’s confession implicating another defendant at their joint trial violated the latter’s Sixth Amendment rights. 391 U.S. at 135-137, 88 S.Ct. 1620. Thus, “where two defendants are tried jointly, the pretrial confession of one cannot be admitted against the other unless the confessing defendant takes the stand.” Richardson v. Marsh, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). This preclusion applies “even if the jury is instructed to consider that confession only against the codefendant [that made the statement].” Id. at 207, 107 S.Ct. 1702.[4]
When Bruton was originally handed down, the types of statements to which the holding applied were much broader. See California v. Green, 399 U.S. 149, 155-158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The Supreme Court, in Crawford, however, limited the spectrum of statements that the Confrontation Clause guards to only “testimonial” statements. 541 U.S. at 58, 124 S.Ct. 1354. Numerous courts have applied this holding to the preclusive effect of Bruton. See State v. Hunter, 11-0291, p. 2 (La.4/8/11), 59 So.3d 1258, 1259; State v. Massey, 11-357, p. 40-41 (La.App. 5 Cir. 3/27/12), 91 So.3d 453, 479. See also U.S. v. Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir.2010); U.S. v. Pike, 292 Fed.Appx. 108, 112 (2nd Cir.2008); U.S. v. Johnson, 581 F.3d 320, 326 (6th Cir.2009); U.S. v. Avila Vargas, 570 F.3d 1004, 1008-1009 (8th Cir.2009); U.S. v. Clark, 717 F.3d 790, 815 (10th Cir.2013). We agree with their reasoning. Thus, in order for a defendant to have a viable claim under Bruton, his non-testifying co-defendant’s out-of-court statement sought to be introduced by the prosecution must be testimonial.
2
In this case, the trial court admitted, over the objection of Mr. Norah’s counsel, the recordings of jailhouse calls made by Mr. Norah’s co-defendant, Mr. Watts. During the calls in question, Mr. Watts makes numerous references to his actions with his counterpart, “G.I.,” a nickname that can easily be attributed to Mr. Norah given the context. At one point, Mr. Watts states, “Man, they got me, son.... Me and G.I., man.” Later, in that same conversation, an “unknown male” asks Mr. Watts whether the police arrested him and G.I. for attempted second degree murder, and Mr. Watts confirms this. These two statements alone sufficiently identify Mr. Norah as “G.I.” After making these statements, Mr. Watts confesses to both the murder at The Duck Off and the attempted murder of Mr. Brown, and implicates Mr. Norah by stating, “Yeah, we knocked one off at the duck off [sic] and we caught the other one at Elysian Fields and Claiborne.”
These statements, however, while of the exact type about which Bruton was concerned, are “non-testimonial.” The U.S. Supreme Court, in Crawford, provided a “core class of testimonial statements”— only one of which is relevant in this instance: “statements ... made under cir *190 cumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” 541 U.S. at 51-52, 124 S.Ct. 1354.
To determine whether Mr. Watts’ statements qualify as “testimonial,” we must determine the conversation’s “primary purpose,” Bryant, 131 S.Ct. at 1150 (citing Davis, 547 U.S. at 822, 126 S.Ct. 2266), by objectively examining the understanding and | ;>fipurpose of both parties as reasonable actors in their actual circumstances. See id. at 1162.
Mr. Watts made calls while in booking at Orleans Parish Prison in an effort to have someone retrieve some “twine” from a dumpster, record the license plate number of a vehicle, and discover the identity of the owner of that vehicle. The person receiving this call was presumably considering performing a favor for a friend.
Phone calls from an inmate to another private citizen are generally “non-testimonial.” These conversations are simply too attenuated in kind from a police interrogation.[5] While inmates are warned that their calls are being recorded, the statements of inmates and those with whom they are speaking are “non-testimonial” in that they are not attempting to prove some fact for introduction at trial such as when the police interrogate a suspect. These statements are not made “to a police officer, during the course of an investigation, or in a structured setting designed to elicit responses that are intended to be used to prosecute him.” Castro-Davis, 612 F.3d at 65. These calls were conversations amongst friends, and in no way could be considered testimonial.
V
The defendants contend that the trial court abused its discretion by permitting the prosecution to introduce officer testimony and the recordings of 9-1-1 calls regarding the other shooting, which occurred earlier that morning at The 127Puck Off. The 9-1-1 call recordings and officer testimony in question were properly admitted under La. C.E. art. 404 B(l).
A
“Generally, courts may not admit evidence of other crimes to show [a] defendant is a man of bad character who has acted in conformity [therewith].” State v. Taylor, 01-1638, p. 10 (La.1/14/03), 838 So.2d 729, 741. See also La. C.E. art. 404 B; State v. Brown, 03-1616, p. 11 (La.App. 4 Cir. 3/31/04), 871 So.2d 1240, 1247. The Louisiana Code of Evidence provides a limited exception, however, “when [evidence] relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.” La. C.E. art. 404 B(l).
This exception is commonly referred to as res gestae.[6] Whether other criminal acts constitute “an integral part of the act or transaction” is determined by a *191 rule of “narrative completeness.” See Brown, 03-1616 at p. 11, 871 So.2d at 1248. This means that such criminal acts “are deemed admissible because they are so nearly connected to the charged offense that the state could not accurately present its case without reference to them.” Taylor, 01-1638 at p. 10, 838 So.2d at 741. The fact that other crimes occurred with other victims in other areas does not necessarily preclude their inclusion under La. C.E. art. 404 B(1). See id., 01-1638 at p. 14, 838 So.2d at 743. “[D]octrine in Louisiana [regarding the admissibility of evidence under La. C.E. art. 404 B(l) ] is broad and includes not only spontaneous utterances and declarations made before and after commission of crimes but also includes testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances.” Drew, 360 So.2d at 518. See also State v. Batiste, 318 So.2d 27, 33 (La.1975).
“[Thus, it is] not simply whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct but whether doing so would deprive its case of narrative momentum and eohesiveness.” State v. Colomb, 98-2813, p. 4 (La.10/1/99), 747 So.2d 1074, 1076. This rule “reflects the fact that making a case with testimony and tangible things not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness.” Id., 98-2813 at pp. 3-4, 747 So.2d at 1076 (quoting Old Chief v. United States, 519 U.S. 172, 186, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997)).
B
Nothing about the events at The Duck Off was withheld from the jury’s knowledge. The shooting at The Duck Off occurred forty-five minutes prior to and in the same neighborhood as the shooting of Mr. Brown. The recordings of the 9-1-1 calls from the shooting at The Duck Off established that a red Monte Carlo, the same vehicle driven by the defendants, was observed fleeing the scene of that shooting. Furthermore, the shooting at The Duck Off was discussed in relation to lathe police’s subsequent search for that red Monte Carlo. Officer Chenevert stated that, while at the scene of The Duck Off shooting, he observed a red Monte Carlo driving in an unusually slow manner, and ran to his squad car in order to pursue and locate the vehicle, causing a high-speed chase. Additionally, Detective Vilen mentioned the shooting at The Duck Off when testifying about his conversation with Officer Chenevert. The defendants claim that the mentioning of a shooting was unnecessary, and that omitting the specific crime would not have undermined the “narrative completeness” of the State’s case. We disagree.
The trial judge did not circumscribe the prosecution’s ability to develop its story of how the events at The Duck Off related to and helped to explain the attempted killing of Mr. Brown. The officers’ testimony regarding the shooting at The Duck Off as well as the recordings of the 9-1-1 calls were essential to laying the foundation of the prosecution’s case, which began as an investigation of one shooting and culminated in the prosecution of another. The evidence regarding The Duck Off shooting allowed the jury to understand the actions of the police, including how and where the red Monte Carlo was located, and the impetus for Officer Chenevert to initiate such a dangerous high-speed chase.
Furthermore, the evidence and testimony regarding the shooting at The Duck Off provided clarification for the defendants’ motive and the severity of their reaction to *192 the possibility of Mr. Brown implicating them in a shooting. Lastly, this evidence was relevant to provide foundation for a statement in Mr. Watts’ recorded jailhouse calls in which he states, “[W]e knocked one off at the duck off [sic].” |anThus, the shooting at The Duck Off formed an integral part of the context of the events that occurred that evening, and was properly admitted under La. C.E. art. 404 B(l).
Next, the defendants claim that, even if this testimony and evidence is admissible under La. C.E. art. 404 B(l), the evidence still should have been excluded as its prejudicial effect outweighed its probative value under La. C.E. art. 403. It is unclear whether evidence, after being found admissible under La. C.E. art. 404 B, must then be subjected to the balancing test of La. C.E. art. 403. See Taylor, 01-1638 at pp. 16-17, 838 So.2d at 745. Compare State v. Brown, 428 So.2d 438, 442 (La.1983) with Colomb, 98-2813 at pp. 4-5, 747 So.2d at 1076.
Nevertheless, the probative value of the testimony and evidence regarding the shooting at The Duck Off outweighed its prejudice to the defendants. The mentioning of the shooting at The Duck Off was not some veiled attempt to “lure the fact-finder into declaring guilt on a ground different from proof specific to the offense charged.” Id., 98-2813 at p. 5, 747 So.2d at 1076 (quoting Old Chief, 519 U.S. at 180, 117 S.Ct. 644).
VI
The defendants contend that the trial court abused its discretion under La. C.E. art. 104 in admitting into evidence the tape recordings of jailhouse calls made by the defendants, and allowing the jury to read transcripts of those calls while the recordings were played at trial neither was properly authenticated under La. C.E. art. 901 A. We disagree.
IsiA
For evidence to be admitted at trial, it must be identified and authenticated. See State v. Magee, 11-0574, p. 41-42 (La.9/28/12), 103 So.3d 285, 315-316 (citing State v. Drew, 360 So.2d 500, 518 (La.1978)). “[I]dentification can be visual, that is, by testimony at the trial that the object exhibited is the one related to the case.” Id., 11-0574 at p. 42, 103 So.3d at 315-316. “[T]he trial judge must [then] determine if the item offered is sufficiently authentic so as to warrant its admission.” Barriere Const. Co., Inc. v. Systems Contractors Corp., 99-2869, p. 5 (La.App. 4 Cir. 5/17/00), 764 So.2d 127, 130. Evidence must be authenticated by a showing “sufficient to support a finding that the matter in question is what its proponent claims.” La. C.E. art. 901 A. Authentication only requires consideration of “whether or not there are indicia of genuineness sufficient to support a finding that the item in question is what it purports to be.” Barriere, 99-2869 at p. 5, 764 So.2d at 130-131. Section B of Article 901 provides examples of means of authenticating evidence, including the testimony of a “witness with knowledge.” La. C.E. art. 901 B(1).
B
Here, the prosecution called Don Hancock, the telecommunications supervisor for the Orleans Parish Sheriffs Office, as their “witness with knowledge.” As part of his position, Mr. Hancock maintains the telecommunications systems at the prison, including the archives of recorded prisoner calls, and is the custodian of those records. The prosecution then had Mr. Hancock identify and authenticate both the tape recordings and the transcripts of the defendants’ jailhouse calls.
I32I
Regarding the tape recordings of the defendants’ jailhouse calls, Mr. Han *193 cock explained that every inmate call is recorded and stored as part of a regular protocol at the prison. These calls are then catalogued according to the folder number of each prisoner.[7] Mr. Hancock explained that each disc was made by entering the defendants’ folder numbers into the archiving system, and burning the recordings onto that disc. Mr. Hancock identified the discs containing the recorded calls made by the defendants from April 19th to April 26th of 2010 while they were in custody at Orleans Parish Prison. Mr. Hancock testified that, while he did not burn the CD himself, his associate, Jim Huey, did create the discs.
While Mr. Hancock may not have tied the tape recordings to the defendants through voice identification, Mr. Hancock made a sufficient showing of authenticity under La. C.E. art. 901. The recordings were directly tied to the defendants by their unique folder numbers. The trial judge did not abuse his discretion in admitting the tape recordings of the defendants’ jailhouse calls into evidence as they were sufficiently authenticated under La. C.E. art. 901.
Once the judge makes this determination, the “factfinder ultimately determines whether the evidence is genuine.” Barriere, 99-2869 at p. 6, 764 So.2d at 131. During cross-examination, after the admission of this evidence, Mr. Hancock admitted that, when making calls, inmates punch in their folder numbers manually, and that inmates punch in each other’s numbers “all the time” when making calls. The fact that others could have made calls using the defendants’ [^folder numbers is, however, a matter that the jury considers in its determination of the weight to give such evidence.
2
Transcripts of tapes introduced at trial have long been held admissible over a best evidence objection as they assist juries in following the playback of tapes. See State v. Burdgess, 434 So.2d 1062, 1066 (La.1983) (citing State v. Snedecor, 294 So.2d 207, 210 (La.1974); State v. Roche, 341 So.2d 348, 352 (La.1976)). See also State v. Lyons, 597 So.2d 593, 601 (La.App. 4th Cir.1992). In regards to the transcripts, Mr. Hancock stated that, while he did not prepare the transcripts of the call excerpts, he did have an opportunity to compare the transcripts of the calls with the recordings themselves, and found the transcripts accurately reflected the dialogues contained in the recordings.
The defendants neither raised any specific objection to the actual content of the transcripts in pre-trial motions or during trial, nor made any showing that the transcript differed in any way from the tape recordings. All objections dealt with the prosecution’s means of authenticating the evidence. Mr. Norah, in brief, argues that the unknown transcriber, without any factual basis, attributed statements to multiple speakers, such as “Christina,” “Big Joe,” “Defendant Watts,” and “Defendant Norah.” Mr. Norah claims that, as a result of this, the transcripts are not accurate reflections of the recorded calls, and that their subsequent admission at trial prejudiced the defendants through the false attribution of statements to them. Because, however, this was not raised in the trial court, it is not properly preserved for our review. See La.C.Cr.P. art. 841.
This showing was sufficient for the trial court to find that the transcripts were *194 what the prosecution claimed them to be— transcripts of jailhouse calls made | 34by the defendants. The trial judge did not abuse his discretion when he found the transcripts to be sufficiently authentic. The trial judge’s ruling was proper under La. C.E. art. 901.
VII
In their final joint assignment of error, the defendants contend that the trial court erred by failing to declare a mistrial after the prosecutor made multiple improper statements during his closing rebuttal argument. We find, however, that the trial court did not abuse its discretion in ruling that the defendants were not so prejudiced by the prosecutor’s commentary that they were denied a fair trial.
A
La.C.Cr.P. art. 774 operates to limit the scope of counsel’s closing argument to the “evidence admitted, to the lack of evidence, to conclusions of fact that the state or defendant may draw therefrom, and to the law applicable to the case.” La.C.Cr.P. art 774. See also State v. Draughn, 05-1825, p. 44 (La.1/17/07), 950 So.2d 588, 614. The state’s closing rebuttal argument is even further limited in scope “to answering the argument of the defendant.” La.C.Cr.P. art. 774.
“A trial judge has broad discretion in controlling the scope of the closing argument,” Draughn, 05-1825 at p. 44, 950 So.2d at 614 (quoting State v. Prestridge, 399 So.2d 564, 580 (La.1981)), see also State v. Casey, 99-0023, p. 17 (La.1/26/00), 775 So.2d 1022, 1036, and prosecutors are granted wide latitude in choosing their closing argument tactics. See Id. (citing State v. Martin, 539 So.2d 1235, 1240 (La.1989); State v. Copeland, 530 So.2d 526, 540 (La.1988)).
We review a trial judge’s finding of whether the prosecutor’s comments prejudiced the defendants’ access to a fair trial for abuse of discretion. See La.C.Cr.P. art. 775; La.C.Cr.P. art. 771. A prosecutor’s improper comments must | ¡¡.¡always be considered in light of both closing arguments and any other admonitions or commentary from the trial judge. See State v. Sharp, 418 So.2d 1344, 1349 (La.1982). Even when the prosecutor exceeds permissible bounds, a reviewing court should “not reverse a conviction unless thoroughly convinced’ that the argument influenced the jury and contributed to the verdict.” State v. Casey, 99-0023 at p. 17, 775 So.2d at 1036; see also State v. Smith, 11-0091, p. 28 (La.App. 4 Cir. 7/11/12), 96 So.3d 678, 694-695. Often, the proper disposition in these cases is to admonish the prosecution rather than finding reversible error. Id., 11-0091 at p. 29, 96 So.3d at 695 (citing State v. Byrne, 483 So.2d 564, 575 (La.1986)); Sharp, 418 So.2d at 1349. This is because a mistrial is a drastic remedy, see Draughn, 05-1825 at p. 44, 950 So.2d at 614, that is hesitatingly granted in Louisiana due to our deep-rooted trust in our jurors’ good sense and fair-mindedness. See State v. Ricard, 98-2278, p. 5 (La.App. 4 Cir. 1/19/00), 751 So.2d 393, 396.
B
In this case, the prosecutor made numerous improper comments. He began by stating, “[W]hat Dayshawn Brown did yesterday was probably the most dangerous thing you can do in this city.... He got on the stand and testified about a shooting that took place in Orleans Parish. Y’all know what’s going on in the street. He might as well have put a red X on his back.” Defense counsel objected twice during this statement. The trial court overruled the first objection, but subsequently the trial judge found the *195 statements to be an “inappropriate argument,” and told counsel to “[m]ove forward.”
The prosecution then began to discuss the tape recordings of the defendants’ jailhouse calls, commenting that “[t]hey made plans to get that license plate, cover themselves. Cover themselves, get that license plate, maybe so they could finish |3fioff [Mr. Brown].” In responding to defense counsel’s timely objection, the Court said, “The jury either heard or didn’t hear it. That’s the jury’s decision.” Counsel then continued with similar commentary, and defense counsel moved for a mistrial. The trial court denied this motion.
Finally, the prosecution finished by stating, “Yesterday, you heard testimony in this case.... [Y]ou found out what Sean Watts and Joseph Norah are, they’re killers.... They are killers.... You can call them whatever you want. You can call them Saint Watts, Saint Norah, whatever you want. They’re killers.” After numerous interlaced objections by defense counsel, the trial judge finally relented, urging the prosecutor to “[c]orrect [his] language.”
The prosecutor’s comments in this case were improper. His comments were loosely based, at best, on a conclusion from statements in both defendants’ jailhouse calls. See La.C.Cr.P. art. 774. The trial judge, however, sufficiently admonished the prosecutor such that the influence of his comments on the jurors was diminished. A judge’s proper admonishing of counsel can assist the jury during their deliberations in parsing through improper commentary that occurred in closing argument. The trial judge, in this case, de-dared the prosecutor’s commentary to be “inappropriate,” and told counsel to “move on” in front of the jury. The prosecutor then continued his commentary by labeling Mr. Norah and Mr. Watts as “killers.” This inflammatory statement was responded to again by the trial court by ordering the prosecutor to “correct his language.” This direction was sufficient to ensure the jury would not consider these statements in its deliberations.
While the prosecutor’s commentary was certainly improper, we do not find that the trial court abused its discretion in not finding the prosecutor’s comments [^sufficiently prejudicial to undermine defendants’ access to a fair trial, and denying the defendants’ motion for a mistrial.
VIII
Mr. Norah claims that the sentence imposed by the trial judge after he was adjudicated a fourth felony offender under La. R.S. 15:529.1 was constitutionally excessive under La. Const, art. I, § 20. Mr. Norah’s sentence, however, is actually three months shorter than the legislatively-mandated fifty-year minimum sentence for this matter. Because Mr. Norah suggests no basis for further deviation below the fifty-year minimum, we affirm his sentence, and find that the sentencing judge did not abuse his discretion in imposing Mr. No-rah’s sentence.
A
Article I, Section 20 of the Louisiana Constitution of 1974 prohibits any law from subjecting a person to excessive punishment. The excessiveness of a sentence is a question of law reviewable by this Court under its appellate jurisdiction.[8] See La. Const. Art. 5, § 10. The Louisi *196 ana Constitution differs from the Eighth Amendment to the U.S. Constitution in its explicit prohibition of excessive sentences. This “deliberate inclusion by the redactors of the Constitution of a prohibition against excessive’ as well as cruel and unusual punishment broadened the duty of this court to review the sentencing aspects of criminal statutes.” State v. Baxley, 94-2982, p. 4 (La.5/22/95), 656 So.2d 973, 977. A sentence is constitutionally excessive if “it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain Island suffering and is grossly out of proportion to the severity of the crime.” State v. Davis, 449 So.2d 452, 453 (La.1984).
The prohibition against excessive sentences requires review of statutory sentencing guidelines in relation to the particular offense and offender. See State v. Sepulvado, 367 So.2d 762, 766 (La.1979). “[P]enalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society.” State v. Landry, 03-1671, p. 8 (La.App. 4 Cir. 3/31/04), 871 So.2d 1235, 1239. The range of discretion granted a sentencing judge in handing down a sentence fluctuates depending on the interactivity of the facts of a particular case, the permissible criminal sanctions, and the range of conduct prohibited by the particular criminal statute that the defendant is convicted of violating. See Sepulvado, 367 So.2d at 766. While a legislature’s determination of what is the appropriate minimum sentence for a particular offense should be afforded deference by the judiciary, courts may still deviate below the mandatory minimum sentence when “there is clear and convincing evidence in the particular case before it which would rebut [the] presumption of constitutionality [of the sentencing scheme of the statute that forms the basis of sentencing as applied to this particular defendant].” State v. Johnson, 97-1906, p. 7 (La.3/4/98), 709 So.2d 672, 676.
A reviewing court should not set aside a sentence imposed by a trial court absent a manifest abuse of this discretion. See State v. Batiste, 06-0875, p. 17 (La.App. 4 Cir. 12/20/06), 947 So.2d 810, 820 (emphasis added). Our sentence review should strive only to correct “abuses of sentencing power” by the district judge, Sepulvado, 367 So.2d at 767, and not to attempt to impose sentences that we deem more appropriate. See State v. Soraparu, 97-1027, p. 1 (La.10/13/97), 703 So.2d 608, 608 (per curiam). “[A] remand for resen-tencing is appropriate only when |39there appears to be a substantial possibility that the defendant’s complaints of an excessive sentence have merit.” Id., 97-1027 at p. 1; 703 So.2d at 608. (internal quotations and punctuation omitted). See also State v. Black, 98-0457, p. 9 (La.App. 4 Cir. 3/22/00), 757 So.2d 887, 892.
B
Mr. Norah was found guilty by a jury of the attempted second degree murder of Mr. Brown. The range of Mr. Norah’s sentence, if it was his first felony conviction, would have been ten to fifty years. See La. R.S. 14:27 D(1)(a); La. R.S. 14:30.1 B. However, Mr. Norah was then subsequently adjudicated a fourth felony offender under La. R.S. 15:529.1 A(4)(a) after the State proved Mr. Norah’s previous convictions for two counts of possession of cocaine and one count of possession of cocaine with intent to distribute. In sentencing the defendant, the trial court was required to impose “a definite term not less than the longest prescribed for a first conviction but in no event less than twenty years and not more than his natural life.” La. R.S. 15:529.1 A(4)(a).
*197 As previously stated, the longest prescribed term for a first conviction of attempted second degree murder is fifty years. The sentencing judge imposed a term of forty-nine and three-fourths years — three months less than the statutorily-mandated minimum sentence.[9] Counsel for Mr. Norah asserts that the permissive range for sentencing in this case is twenty years to Mr. Norah’s natural life. The Habitual Offender law provides that the minimum sentence for a fourth felony offender is the maximum sentence for a first time felony conviction under that particular felony, or, should that felony’s maximum sentence be less than 20 years, 14ftthen the minimum sentence, upon being adjudged a fourth offender, is 20 years. See La. R.S. 15:529.1 A(4)(a).
A sentence at or below the mandatory minimum may still be ruled constitutionally excessive under La. Const. art. I, § 20. See State v. Parker, 12-0588, p. 14 (La.App. 4 Cir. 8/20/18), 112 So.3d 366, 374. It is Mr. Norah’s burden, however, . to rebut the presumption of the constitutionality of a mandatory minimum sentence under the Habitual Offenders Law as applied to his particular circumstance by clear and convincing evidence. See Johnson, 97-1906 at p. 8, 709 So.2d at 676. This departure should only occur in rare instances. See State v. Douglas, 06-0319, pp. 5-6 (La.App. 4 Cir. 2/14/07), 952 So.2d 793, 797.
Mr. Norah makes no such showing outside of his assertion that all of his prior crimes were non-violent. In making his decision, the sentencing judge considered numerous other factors, including that Mr. Norah was not the shooter in this case, that he did not have a lot of family in the New Orleans area, and that he has two children. None of these are sufficient to show that his sentence of forty-nine and three-fourths years is unconstitutionally excessive. See La.C.Cr.P. art. 894.1.
DECREE
The convictions of Joseph Norah and Sean Watts for the attempted second degree murder of Dayshawn Brown are affirmed as are the sentences imposed upon them as habitual offenders.
AFFIRMED.

. See La. Const. art. I, § 17 and La.C.Cr.P. art. 782. See also Apodaca v. Oregon, 406 U.S. 404, 412, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); State v. Bertrand, 08-2215, p. 8 (La.3/17/09), 6 So.3d 738, 743; State v. Lawrence, 09-1637, pp. 18-19 (La.App. 4 Cir. 8/25/10), 47 So.3d 1003, 1013.

. We always review for errors patent. See La.C.Cr.P. art. 920(2). We identified none which concern the defendants’ convictions. We did identify one which concerned Mr. Norah’s sentence. The sentencing judge neglected to specifically state that Mr. Norah’s entire sentence would be served without the benefit of probation, suspension of sentence, or parole. This, however, does not require any action by this Court as it is automatically corrected. See La. R.S. 15:529.1 G; La. R.S. 15:574.4 A(l)(a); La. R.S. 15:301.1 A.

. In Bryant, police came upon a man suffering from a gunshot wound in a gas station parking lot without knowledge of the whereabouts or the motive of the perpetrator. See Id. at 1156. This broadened the ongoing emergency exception “beyond an initial victim to a potential threat to the responding police and the public at large.” Id. at 1155.

. Often the remedy for possible Bmton violations is for the trial court to grant a severance due to the heightened risk of prejudice. See Richardson, 481 U.S. at 217, 107 S.Ct. 1702.

. Several other courts have found that recordings of inmates speaking on jailhouse phones and with other inmates are ‘‘non-testimonial” in nature. See Figueroa-Cartagena, 612 F.3d at 87; Massey, 11-357 atpp. 40-41, 91 So.3d at 479; U.S. v. Castro-Davis, 612 F.3d 53, 65-66 (1st Cir.2010); Saechao v. Oregon, 249 Fed.Appx. 678, 679-680 (9th Cir.2007).

. Res gestae, translated from Latin to English, means "things done." The res gestae doctrine is one of the most criticized in the law. Professor George Pugh of LSU Law School was fond of saying that the phrase is Latin for "let it in.” See George W. Pugh et al., Evidence, 45 La. L.Rev. 309, 315 (1984). Additionally, Judge Learned Hand once claimed that, if res gestae "means anything but an unwillingness to think at all, what it covers cannot be put in less intelligible terms.” United States v. Matot, 146 F.2d 197, 198 (2nd Cir.1944).

. A folder number is the number given to each prisoner upon entry to the Orleans Parish Prison System, and forms the basis of the identity of that prisoner for the entire time that prisoner is incarcerated for that particular charge.

. A sentence is the penalty imposed by the court upon a verdict of guilty. Sentence shall be pronounced orally in open court, and recorded in the minutes of the court. See La. C.Cr.P. art. 871.

. Because the district attorney has not appealed the trial court’s imposition of this sentence, we do not review the trial court's departure from the legislatively-mandated minimum sentence. See, e.g., Greenlaw v. U.S., 554 U.S. 237, 244-245, 128 S.Ct. 2559, 171 L.Ed.2d 399 (2008).